**VIVITAR CORPORATION, Appellant,**

v.

**The UNITED STATES, et al., Appellees,**

**and**

**47th Street Photo, Inc., Intervenor.**

**Appeal No. 84–1638.**

United States Court of Appeals,
Federal Circuit.

May 6, 1985.

Davis, Circuit Judge, filed an opinion concurring in the result.

James M. Johnstone, Wiley & Rein, Washington, D.C., argued for appellant. With him on brief was Thomas W. Kirby.

Steven P. Kersner and Donald S. Stein, Brownstein, Zeidman and Schomer, Washington, D.C., were on brief for appellant.

R. Kenton Musgrave, General Counsel, Vivitar Corp., Santa Monica, Cal., of counsel.

Marjorie M. Shostak and James F. O'Hara, Stein, Shostak, Shostak & O'Hara, Washington, D.C., of counsel.

David M. Cohen, Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellees. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen. and Velta A. Melnbrencis.

Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Washington, D.C., argued for intervenor, 47th Street Photo, Inc. With him on brief was Jamie S. Gorelick. Marvin H. Wolf, Groman & Wolf, Mineola, N.Y., was on brief for intervenor.

Edward T. Borda, General Counsel, Ass'n of General Merchandise Chains, Inc., Washington, D.C., was on brief for amicus curiae.

Robert Ullman, Jacob Laufer and Steven R. Trost, Bass & Ullman, New York City, was on brief for amicus curiae, American Free Trade Ass'n.

John M. Hadlock, Max F. Schutzman and Katherine L. Frank, Whitman & Ransom, New York City, was on brief for amicus curiae, Olympus Corp.

Robert W. Steele, P.C., and Robert E. Hebda, Steele, Simmons & Fornaciari, of Washington, D.C., was on brief for amicus curiae, K Mart Corp. James C. Tuttle, Antitrust & Intern. Counsel, Troy, Mich., was on brief for K Mart Corp.

William H. Allen, Eugene A. Ludwig, Scott D. Gilbert and Daniel A. Rowley, Covington & Burling, Washington, D.C., were on brief for amicus curiae, Coalition to Preserve The Integrity of American Trademarks.

William F. Sondericker, Frank W. Gaines, Jr. and Robert L. Hoegle, Olwine, Connelly, Chase, O'Donnell & Weyher,

Washington, D.C., were on brief for amicus curiae, Progress Trading Co., Inc.

Before MARKEY, Chief Judge, and RICH, DAVIS, NIES and BISSELL, Circuit Judges.

NIES, Circuit Judge.

This appeal concerns the importation into the United States of what have come to be called "grey market" goods. Goods are produced and legitimately sold abroad under a particular trademark and are imported into the United States and sold in competition with goods of the owner of U.S. trademark rights in the identical mark. But for international boundaries and the territoriality of trademark rights, the use of the trademark in competition with the U.S. owner would not constitute infringement because of the relationship between the foreign entity from whom the goods were directly or indirectly obtained and the owner of U.S. rights in the mark. In this sense, grey market goods are "genuine" and bear a "genuine" trademark. In some instances, the U.S. trademark owner is an importer of the goods as well, in which case the grey market goods are known as "parallel importations."

Vivitar Corporation, a California corporation, brought suit in the U.S. Court of International Trade against the United States for a declaratory judgment to invalidate regulations of the Department of Treasury Customs Service which, in Vivitar's view, improperly allow importation of grey market goods contrary to the express provisions of 19 U.S.C. § 1526 (Section 526, Tariff Act of 1930, hereinafter § 1526). Specifically, Vivitar seeks to force the Customs Service to refuse importation of any foreign manufactured photographic equipment bearing its U.S. registered trademark VIVITAR unless Vivitar gives specific consent to such importation. Vivitar's position

is that § 1526(a) gives it an absolute right, as a U.S. company owning a U.S. trademark registration, to require Customs to prevent importation of foreign manufactured goods bearing the trademark VIVITAR, and that the regulations of the Customs Service which recognize some exceptions to the bar against importation without the consent of the U.S. trademark owner are invalid. The Court of International Trade upheld the regulations as the correct interpretation of the statute.

In this appeal, Vivitar urges reversal of the judgment of the Court of International Trade as a matter of law. The United States endorses the decision of the court on the merits, but challenges that court's holding that it had jurisdiction over the subject matter.[1] Intervenor, 47th Street Photo, Inc., urges affirmance of the appealed judgment in its entirety.[2]

We conclude that the Court of International Trade correctly held that it has jurisdiction over the subject matter of this action under 28 U.S.C. § 1581(a), (i)(3), and/or (i)(4). With respect to the merits, we conclude that Customs' regulations do not define the limits of protection afforded a U.S. trademark owner under § 1526. We, nevertheless, conclude that the regulations are a reasonable exercise of Customs' power to exclude under the statute as a matter of agency initiated enforcement. Since the factual situations involving grey market importations vary widely and not all may be in violation of § 1526(a), we hold that Customs is not required to provide for automatic exclusion beyond that set forth in its current regulations. Exclusion of goods in situations involving common ownership and/or control of U.S. *and* foreign trademark rights may be left by Customs for determination in the first instance by the courts. When a U.S. trademark owner has

1. The decisions of the Court of International Trade on jurisdiction and the merits are reported at 585 F.Supp. 1419 (1984) and 593 F.Supp. 420 (1984), respectively.

2. Amicus briefs have been accepted from Olympus Corporation, Coalition to Preserve the Integrity of American Trademarks, American Free Trade Association, The National Association of Catalog Showroom Merchandisers, Progress Trading Company, Inc., K-Mart Corporation and the Association of General Merchandise Chains, Inc.

successfully pursued a claim against a private party, Customs must, of course, give effect to any judicial determination that the owner has a right to bar importation of goods bearing its mark, even though the goods were obtained from or through a foreign related company.

Accordingly, we affirm the judgment of the Court of International Trade, but on narrower grounds.

### I.

This appeal is from the grant of summary judgment in favor of the government and the denial of summary judgment in favor of Vivitar. Since no trial was conducted, there is little in the record with respect to the exact nature of Vivitar's activities in the United States and abroad. Nor do we have a specific import transaction before us which is challenged. The challenge by Vivitar is against the regulations *per se*. The material facts on which the parties rely are few and not in dispute. Essentially the facts establish Vivitar's standing to challenge the regulations.

Vivitar Corporation, a domestic corporation organized under the laws of the state of California, is the owner of U.S. Trademark Reg. No. 808,478, issued May 17, 1966, covering the trademark VIVITAR for some kinds of photographic equipment.[3] The registration has been recorded since 1969 with the U.S. Customs Service pursuant to regulations implementing exclusion provisions in the customs statute (§ 1526), as well as other exclusion provisions found in the trademark statute, 15 U.S.C. § 1124.

Vivitar is engaged in the sale of photographic equipment in the United States and abroad. Apparently, Vivitar has little or no manufacturing facilities of its own, but rather has its products manufactured to specification by various foreign manufacturers, principally in Japan.[4] The trade-

mark VIVITAR is affixed or displayed on this equipment at Vivitar's direction. Vivitar has set up a worldwide marketing arrangement so that the parent, appellant here, retains the U.S. market, and various foreign subsidiary corporations sell abroad. We will assume that Vivitar and its subsidiaries are selling the same products. No information is of record with respect to technical ownership of foreign trademark rights in the VIVITAR trademark.

In the United States, Vivitar has set up a network of independent authorized dealerships to whom it sells for resale to the public. VIVITAR products are, however, also reaching the U.S. market via independent importers who purchase VIVITAR products abroad (we do not know whether directly from Vivitar's subsidiaries or not), import them into the United States, and sell them through discount outlets, such as intervenor, 47th Street Photo. The price differential between U.S. and foreign markets on VIVITAR equipment makes the discount operations profitable. Vivitar seeks to justify its authorized dealers' higher prices as compared to those of discount houses by its extensive advertising costs, warranty costs, and other legitimate business expenses necessary to promote its VIVITAR products in the U.S. and maintain its goodwill in the mark. Vivitar accuses the discount houses of obtaining a free ride which will eventually destroy the reputation and sales value of its VIVITAR trademark. These matters were not, of course, litigated or resolved by the CIT in ruling on the motions for summary judgment. The sole question was whether Vivitar has a statutory right to have the Customs Service exclude imports of VIVITAR products except those consigned to Vivitar. This issue was not framed in terms of the particular facts of Vivitar's distribution system in the U.S. and abroad, but as a general proposition with respect to the rights

---

**3.** No copy of the certificate appears in the record so that we do not know precisely what goods are described in the registration.

**4.** The foreign manufacturer is referred to as "a licensee" of Vivitar in the CIT opinion. No license is required in such situations since the

manufacturer is not "using" the mark. A supply contract is normally all that is necessary to secure private brand merchandise. *See* 1 H. Nims, *Unfair Competition and Trade-Marks* § 212, at 613–14 (4th ed. 1947).

available under § 1526 to every domestic owner of a registered U.S. trademark.

The statutory provision in dispute, 19 U.S.C. § 1526(a), reads as follows:

Except as provided in subsection (d) of this section, it shall be *unlawful to import* into the United States *any merchandise of foreign manufacture* if such merchandise, or the label, sign, print, package, wrapper, or receptacle, *bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States,* under the provisions of sections 81 to 109 of title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said title 15, *unless written consent of the owner of such trademark is produced at the time of making entry.* [Emphasis added.]

The complete current text of 19 U.S.C. § 1526 appears in the appendix. The remaining sections deal with (b) seizure and forfeiture; (c) private remedies by trademark owners against persons dealing in wrongfully imported goods; (d) exemptions for personal use; and (e) special provisions for goods bearing counterfeit marks. The statute, thus, explicitly provides for a private remedy for violation of (a) in (c) and at least suggests by (a), (b) and (d) that Customs assume an active role *sua sponte* in enforcement.

The current customs regulations, 19 C.F.R. § 133.21, read in pertinent part:

(a) *Copying or simulating marks or names.* Articles of foreign or domestic manufacture bearing a mark or name copying or simulating a recorded trademark or trade name shall be denied entry and are subject to forfeiture as prohibited importations. A "copying or simulating" mark or name is an actual counterfeit of the recorded mark or name or is one which so resembles it as to be likely to cause the public to associate the copying or simulating mark with the recorded mark or name.

(b) *Identical trademark.* Foreign-made articles bearing a trademark identical with one owned and recorded by a citizen of the United States or a corporation or association created or organized within the United States are subject to seizure and forfeiture as prohibited importations.

(c) *Restrictions not applicable.* The restrictions set forth in paragraphs (a) and (b) of this section do not apply to imported articles when:

(1) Both the foreign and the U.S. trademark ... are owned by the same person or business entity;

(2) The foreign and domestic trademark ... owners are parent and subsidiary companies or are otherwise subject to common ownership or control (see §§ 133.2(d) and 133.12(d)');

(3) The articles of foreign manufacture bear a recorded trademark ... applied under authorization of the U.S. owner.

That the regulations are patently less protective of the interests of a U.S. trademark owner than the literal language of the statute is the essence of Vivitar's case.

## II.

### *Jurisdiction*

#### A.

The government's initial response to Vivitar's complaint was to file a motion to dismiss for lack of jurisdiction in the Court of International Trade (CIT).

The government's position is that the statute which Vivitar asserts has been violated, 19 U.S.C. § 1526(a), is one which relates to trademarks. Thus, in the government's view, 28 U.S.C. § 1338(a), which grants jurisdiction to the U.S. district courts over "any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and *trade-marks*" (emphasis added) is controlling on the jurisdictional question. The government concludes that since the CIT

possesses *exclusive* jurisdiction only, not concurrent jurisdiction with the federal district courts, the CIT cannot possess jurisdiction over the present action.

Vivitar argues that its complaint can rest on several bases under 28 U.S.C. § 1581(i).[5] Specifically, Vivitar relies on the CIT's jurisdiction under 28 U.S.C. § 1581(i)(3) over a civil action against the United States arising out of a law providing for an "embargo" or "quantitative restriction," and on the court's administration and enforcement powers under 28 U.S.C. § 1581(i)(4) over protests (28 U.S.C. § 1581(a)).[6] Under either of these theories, the claim falls within the *exclusive* jurisdiction of the CIT, and there is then no jurisdiction in the federal district courts.

In an opinion dated April 4, 1984, Judge Restani denied the government's motion to dismiss for lack of jurisdiction. The court began its analysis by rejecting Customs' argument that the case belonged in federal district court as one arising under the trademark laws within the meaning of 28 U.S.C. § 1338(a). The flaw in the argument, according to the court, was that, while district courts generally have jurisdiction over trademark cases under 28 U.S.C. § 1338, not all cases involving trademarks must be heard in the district courts.[7]

This case, although arising out of a dispute involving a trademark was, nevertheless, considered by the CIT to be within its jurisdiction because "the thrust of plaintiff's grievance is that Customs Service's administration and enforcement of § 1526(a) and (b) is improper." In arriving at this conclusion, the court relied on Vivitar's abandonment of all claims which would require a determination that a third party infringed Vivitar's trademark, and on Vivitar's concession that the goods at issue were properly affixed with the VIVITAR trademark abroad. The court further opined that the validity of Customs Service regulations was a matter particularly within the court's expertise. Moreover, per the court, the regulations were in need of a national, uniform interpretation to avoid confusion and uncertainty.

The court then turned to the jurisdictional statute, 28 U.S.C. § 1581, in particular § 1581(i) quoted in note 5, *supra*, for a specific grant of authority over the case. Referring first to § 1581(i)(4), the court noted its jurisdiction over claims arising out of the administration and enforcement of the matters referred to in § 1581(a)–(h). Under § 1581(a), the court continued, it has jurisdiction "of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 [19 U.S.C. §§ 1514–15] of the Tariff Act of 1930."[8]

---

**5.** 28 U.S.C. § 1581(i) reads as follows:

(i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

(1) revenue from imports or tonnage;

(2) tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

**6.** Judge Restani rejected a third argument based on 28 U.S.C. § 1581(i)(1), and this basis is not reasserted on appeal.

**7.** The court cited a string of cases in support of this, in particular, *Manufacture De Machines Du Haut-Rhin v. Von Raab*, 6 CIT ——, 569 F.Supp. 877 (1983); *Manufacture De Machines du Haut-Rhin v. International Armament Corp.*, No. 82–1114–A (E.D.V.I.1983); *Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 566 F.Supp. 1523 (1983); *cf. Schaper Mfg. Co. v. Regan*, 5 CIT 266, 566 F.Supp. 894 (1983) (case involving copyright issues). The court declined to follow *Parfums Stern, Inc. v. United States Customs Service*, 575 F.Supp. 416 (S.D.Fla.1983), where the district court held that it had jurisdiction of an action similar to the instant case, but did not discuss the CIT's jurisdiction.

**8.** 28 U.S.C. § 1581(a) reads:

The Court of International Trade shall have exclusive jurisdiction of any civil action com-

In this case there had been no protestable *exclusion* of the goods in issue since the disputed regulations permit importation. The court, however, read § 1581(i)(4) broadly as "a residual independent jurisdictional basis for litigating Customs Service administration and enforcement of the substantive matter that may be the subject of a protest, but where the protest remedy is inappropriate or unavailable."

The court reasoned that reading § 1581(i)(4), when applied to § 1581(a), as limited only to cases arising from the administration and enforcement of protests, would render it duplicative to § 1581(a). Rather, citing *United States v. Uniroyal, Inc.,* 687 F.2d 467, 475 (CCPA 1982) (Nies, J., concurring), the court held that its jurisdiction under § 1581(i) was properly invoked, since there was no protestable exclusion and, thus, "the other provisions of 28 U.S.C. § 1581 are manifestly inadequate."

Alternatively, the court ruled that, since § 1526 provides for the exclusion of certain goods, jurisdiction over this case could be found in § 1581(i)(3), as an "embargo" or "quantitative restriction on the importation of merchandise." The court interpreted § 1581(i)(3) as granting the court jurisdiction over cases where the importation of goods is limited to a specific quantity; the statutory exclusion of certain goods under § 1526, in the court's view, constituted a quantitative limit of zero.

### B.

The jurisdiction of the CIT with respect to a suit of this nature has not been uniformly recognized. Several federal district courts have also taken jurisdiction over civil actions against the government involving the importation of grey market goods. *See, e.g., Coalition to Preserve the Integrity of American Trademarks (CPIAT) v. United States,* 598 F.Supp. 844, 224 USPQ 701 (D.D.C.1984) and *Olympus Corpora-*

menced to contest the denial of a protest, in whole or in part, under section 515 of the

*tion v. United States,* No. 84–0920 (E.D. N.Y. Nov. 15, 1984).

In both *Olympus* and *CPIAT,* the thrust of each complaint was that the Customs regulations were inconsistent with § 1526. In each case an injunction was sought against the government for failure to exclude grey market goods.

In both suits jurisdiction was challenged on the basis that the Court of International Trade had exclusive jurisdiction over a civil action against the government concerning the validity of regulations implementing § 1526. Both district courts were aware of, but expressly rejected, Judge Restani's ruling on jurisdiction, holding instead that because the district courts had jurisdiction under 28 U.S.C. § 1331 over federal questions and under § 1338(a) over claims based on a federal statute relating to trademarks, the CIT could not have jurisdiction.

### C.

We are faced then with irreconcilable decisions from two district courts and the CIT, each asserting that the other lacks jurisdiction. However, we do not see that the jurisdictional statutes themselves are irreconcilable.

■ The jurisdiction granted to the U.S. Customs Court, predecessor to the Court of International Trade, has long been recognized as an exception to the jurisdiction of the district courts under 28 U.S.C. § 1331, i.e., federal question jurisdiction. *See, e.g., Sneaker Circus, Inc. v. Carter,* 566 F.2d 396, 398–99 (2d Cir.1977), and cases cited therein. Thus, it is faulty analysis to look first to the jurisdiction of the district courts to determine whether the CIT has jurisdiction. Given the broad jurisdictional grant to district courts, a district court would always have jurisdiction, rather than the CIT, using this approach. The result would negate the intent of Congress in granting *exclusive* jurisdiction over certain matters to the CIT. The focus must be

Tariff Act of 1930.

solely on whether the claim falls within the language and intent of the jurisdictional grant *to* the CIT. Since no new claims were created by the Customs Courts Act of 1980 (the 1980 Act), Pub.Law No. 96–417, 94 Stat. 1727 (1980), which created the CIT, the expanded jurisdiction given to that court, *a fortiori,* means that additional exceptions to the jurisdiction of district courts must result.

With respect to litigation under § 1526 prior to enactment of the 1980 Act, there is no question that a federal district court was the forum for a trademark owner to pursue any claim for exclusion, whether against the government or a private party. However, one purpose of the 1980 Act was to consolidate jurisdiction over suits against the government in international trade matters, placing such matters in the province of the new court. H.R.Rep. No. 96–1235, 96th Cong., 2d Sess. 33, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3729, 3745.

■ In this case, Vivitar raises no question of substantive trademark or unfair competition law with respect to activities of a particular private party. If Vivitar were asking the CIT to determine, for example, that certain goods imported by others and sold in this country under its mark constituted infringement of Vivitar's trademark rights or another form of unfair competition, such subject matter would be beyond the jurisdiction of the CIT. The determinations of the respective rights between private parties under 19 U.S.C. § 1526(c) was not changed by the 1980 Act and, therefore, continues to fall within the jurisdiction of the federal district courts. In contrast, the validity of the regulations governing exclusions of goods by Customs in general is the type of question to which the CIT can bring expertise.

Judge Restani held, and we agree, that Vivitar's action against the government for a determination that the Customs regula-

tions are invalid falls within the exclusive jurisdiction of the CIT as a corollary to protest jurisdiction under 28 U.S.C. § 1581(a). The government attempts to undercut the basis for her analysis by arguing that the exclusion of goods by reason of the trademark thereon is not a matter which an importer may protest. We would agree if the importer were to seek a determination of rights vis-a-vis the trademark owner, a matter to be determined in district court. On the other hand, where the subject matter is the validity of regulations or of procedures thereunder, a protest is appropriate and, therefore, the denial thereof falls within the jurisdictional grant of 28 U.S.C. § 1581(a). *Accord, Lois Jeans & Jackets, U.S.A., Inc. v. United States,* 5 CIT 238, 566 F.Supp. 1523 (1983) (importer brought a declaratory judgment action to determine rights against the trademark owner, while concurrently pursuing a protest to attack the government's failure to comply with regulations). Thus, the basis for Judge Restani's analysis is correct.

We hold alternatively that jurisdiction may rest on 28 U.S.C. § 1581(i)(3) and/or (4), as a civil action against the United States which arises out of an embargo [9] or quantitative restriction on certain goods, and the administration and enforcement thereof.

Accordingly, we affirm the decision of Judge Restani that the CIT has jurisdiction over Vivitar's claim.[10]

## III.

### *Statutory Interpretation*

The issue, as framed by the parties, is whether the regulations of the Customs Service correctly interpret the extent of protection afforded by the statute, 19 U.S.C. § 1526. The provisions of § 1526(a) appear to create a sweeping bar to importation of any goods bearing the same trade-

---

**9.** We note the use of the term "embargo" in the legislative history of § 1526. 62 Cong.Rec. 11,-603 (1922).

**10.** Because the CIT has jurisdiction, we have jurisdiction to review the merits of its decision under 28 U.S.C. § 1295(a)(5).

mark as that owned by a U.S. company without the latter's consent. In contrast, Customs' regulations provide for a more limited prohibition. Under current regulations, a U.S. company must disclose foreign affiliated companies as part of the information required upon recordation of its mark.[11] With respect to goods of these affiliated companies, Customs does not require consent to importation and will not bar importation of goods from these sources bearing the recorded trademark, even if the U.S. trademark owner demands—as Vivitar has done—that the goods be excluded.[12]

The government makes two arguments in support of a narrow reading of the statute which would limit § 1526(a) protection to that provided by the regulations: (1) Congressional intent expressed at enactment and subsequently, and (2) long standing administrative interpretation and practice. Vivitar, on the other hand, argues that the regulations *violate* the statute. Neither party's position is persuasive for reasons discussed below.

## A.

### *Congressional Intent at Time of Enactment*

■ The Court of International Trade concluded from a review of the legislative history that the sole purpose and effect of § 1526 was to nullify the result of the decision of the Second Circuit in *A. Bourjois v. Katzel,* 275 Fed. 539 (2d Cir.1921). The government urges that we adopt the lower court's analysis. Our review of legislative history, however, indicates that, while reversal of the *Katzel* decision was one purpose of § 1526, it was clearly, and we use that word advisedly, not the *sole* purpose. Review of events leading to pas-

sage of § 1526 must begin somewhat earlier than that case.

The Trademark Act of 1905, contained, *inter alia,* the following provisions[13]:

§ 27: That no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this act ... shall be admitted to entry at any custom house of the United States.

The statute also specified that, "to aid" in enforcing the prohibition, the registrant was to record his certificate of registration with the Department of Treasury.

In 1916, the Second Circuit had before it an appeal from an order granting an injunction which prohibited Customs from detaining merchandise which plaintiff Gretsch sought to import. *Fred Gretsch Mfg. Co. v. Schoening,* 238 Fed. 780 (2d Cir.1916). Gretsch bought violin strings in Germany which were manufactured by a German company Mueller and sold there under Mueller's trademark ETERNELLE. Schoening was the exclusive sales agent for Mueller in the United States. Schoening obtained a U.S. trademark registration for ETERNELLE for violin strings and recorded that registration with Customs.[14] When Gretsch attempted to bring in "genuine" ETERNELLE violin strings from Germany, Customs, acting under § 27, barred their importation. Gretsch sued both Schoening and the Collector of Customs in New York in district court and obtained an injunction against the action taken by Customs.

In affirming the injunction, the Second Circuit held that under the law of the Second Circuit, Gretsch's sale of "genuine" Mueller strings under the ETERNELLE mark would not be an infringement. The court then addressed whether Congress,

---

**11.** 19 C.F.R. §§ 133.2(d) and 133.12(d).

**12.** 19 C.F.R. § 133.21(c)(1), quoted *supra.* In 1982, Vivitar submitted a formal request for a letter ruling of its entitlement to exclude all goods bearing the VIVITAR mark unless it consented to importation. After 18 months without reply, Vivitar commenced this action.

**13.** A comparable provision had appeared in statutes prior to the Act of 1905. *See, e.g.,* 16 Stat. 580 (1871), apparently the first of such provisions.

**14.** Whether Mueller agreed that Schoening was the U.S. owner and was entitled to register the mark was not determined in the suit.

nevertheless, intended § 27 to bar importation of "genuine" goods. The court concluded that there was no Congressional intent to bar non-infringing goods—that the words "copy or simulate" in § 27 embraced only infringements.

A few years later, the *Katzel* case, which has some similarities to the *Gretsch* case, was also decided by the Second Circuit. A French company, E. Wertheimer & Cie. (formerly A. Bourjois & Cie.), had established a business in the United States for its products, one of which was face powder sold under the trademark JAVA in a particular style of packaging. In 1913, Wertheimer sold its U.S. business, including all of its rights in the U.S. to its trademarks, trade dress, and trade names (including "A. Bourjois & Cie.") to A. Bourjois & Co., a New York corporation. Bourjois (NY) was not obligated to purchase any products from Wertheimer. However, Bourjois (NY) did, in fact, buy face powder in bulk from Wertheimer, which it then packaged for retail sale in the same style of box which Wertheimer had used in the U.S. and was continuing to use in France.[15]

The defendant Katzel operated a retail pharmacy in New York City. Sometime prior to 1921, Katzel bought a quantity of Wertheimer's retail packaged JAVA face powder in France and began selling the product in her New York store and to other retailers. The packaging for the Wertheimer goods sold by Katzel was almost identical to that of Bourjois (NY), and the products were, in fact, the same. The district court enjoined Katzel's sales as infringements. The Second Circuit, relying on the infringement part of the decision in the *Gretsch* case, reversed on the theory that no infringement occurred since the JAVA face powder Katzel was selling was "genuine." The *Katzel* court did not have before it any issue of blocking importation or the meaning of § 27. The court was simply making a decision on trademark infringement, presumably under the common law of New York.

The Second Circuit decision in *Katzel* had greater significance at the time than may be readily apparent. During World War I, the Alien Property Custodian (an arm of the federal government) had seized assets in this country owned by foreign nationals of enemy countries and had sold them to U.S. interests. Thus, a number of substantial U.S. businesses had been created, e.g., the U.S. maker of BAYER aspirin, which was entirely independent of its German counterpart and which would have been adversely affected by importation of "genuine" goods from abroad with the normalization of international relations. Thus, the *Katzel* litigation was pursued to the U.S. Supreme Court, which accepted the case, and efforts were also directed to Congress to provide relief from the Second Circuit's decision.

Several committees of Congress took up the matter. Fortuitously for proponents of restrictive importation, Congress had before it what became the Tariff Act of 1922, Pub.L. No. 67–318, 42 Stat. 975 (1922), and they were able to add § 1526 as an amendment to that bill. The legislative history of the section is very limited, consisting of a short floor debate in the Senate and a brief paragraph in the Conference Report, which reads in its entirety as follows:

> A recent decision of the circuit court of appeals holds that existing law does not prevent the importation of merchandise bearing the same trade-mark as merchandise of the United States, if the imported merchandise is genuine and if there is no fraud on the public. The Senate amendment makes such importation unlawful without the consent of the owner of the American trade-mark.

H.R.Rep. No. 1223, 67th Cong., 2d Sess. 158 (1922). The "recent decision" was *Kat-*

---

**15.** The principal difference was in the labelling of the respective company names. The Bourjois (NY) product bore the following legend:

> Made in France—Packed in the U.S.A. by A. Bourjois & Co., Inc., of New York, Succ'rs. in the U.S. to A. Bourjois & Cie., and E. Wertheimer & Cie.

The Wertheimer boxes were labelled "A. Bourjois & Cie., E. Wertheimer & Cie., Successeurs."

*zel,* despite the mischaracterization of what the case had actually held.

The government argues that § 1526 was intended to do no more than "protect the property rights of Americans against fraud in the situation in which they had purchased trademark rights from foreign owners yet were unable to obtain relief when goods bearing the genuine trademark continued to be sold and imported." One sponsor did attempt to convince Senators who questioned the sweep of the proposed language that it would have no greater effect than to protect a U.S. purchaser of trademark rights in the U.S. against fraudulent conduct by the foreign seller of those rights.[16] However, opponents were unconvinced. The question was raised as to whether U.S.-made WONDER flour purchased in Canada would be excluded by the provision. The proposed legislation was hastily amended to add the limitation that only foreign manufactured goods were excludable, which took care of at least that objection.

Another supporter indicated he favored the legislation because of the transfer to certain U.S. interests of the BAYER trademark by the Alien Property Custodian. Another agreed that he also understood the purpose of the legislation was to protect such interests. Advocates, thus, were clearly not limiting themselves to the *Katzel* situation.

Our review of the comments in the floor debate leads us to the conclusion that the debate is too unfocused and misinformed to serve as a definitive basis for interpretation of § 1526. The floor debate, like the above committee report, indicates an erroneous understanding of the facts of the *Katzel* case, namely, that the French seller of the JAVA trademark was violating its contract and that the Second Circuit dealt with § 27 of the Trademark Act of 1905 in *Katzel.* The legislation was disparaged during the debate as a "midnight" amendment, the impact of which was not clear.

Under these circumstances, the remarks of one or more Senators are an unreliable indication of the sense of the chamber as a whole or of Congress. The only clear indication from the debate is that Congress realized it was providing a bar to importation even though at least one circuit (the *Katzel* court) would hold that the concurrent use of the mark on the parallel import would not be an infringement. With respect to infringing uses of trademarks on imports, such goods were already excluded, or at least excludable, by § 27 of the trademark statute. Congress did not debate or intend to change trademark law to make uniform what the various courts might hold to be infringements. Rather, it ignored trademark law and, by amendment to customs law, gave a U.S. owner of a trademark a right to exclude foreign goods bearing the same trademark as the U.S. company had registered in the U.S. and recorded with Customs. Ownership of a U.S. trademark registration was a condition to an exercise of that right, but trademark infringement by the importer was not.

At the time of enactment, it cannot be disputed that Congress intended § 1526(a) to provide an exclusion remedy broader than that in § 27 of the trademark statute which, as held in *Gretsch,* was limited by the words "copy or simulate" to the barring of infringements. Additional support for the conclusion that § 1526 is not limited to infringements is found in the language of another paragraph of § 1526 enacted at the same time. That additional provision, 19 U.S.C. § 1526(c), reads:

(c) Any person dealing in any such merchandise [excluded under (a)] may be enjoined from dealing therein within the United States or may be required to export or destroy such merchandise or to remove or obliterate such trade-mark and shall be liable *for the same damages and profits provided for wrongful use of a trade-mark,* under the provisions of such Act of February 20, 1905, as amended. [Emphasis added.]

---

**16.** The floor debate is reported at 62 Cong.Rec. 11,602–05 (1922).

Thus, a private remedy was created against persons dealing in merchandise prohibited under § 1526(a), who were made liable *for the same damages as provided for trademark infringement.* The damage remedy would have been wholly unnecessary if the statute had been intended to reach infringements only, since that remedy was already available in the Act of 1905.

A few months after the enactment of § 1526, the Supreme Court handed down its decision in *A. Bourjois v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923). Emphasizing the territoriality of trademark rights, the Court reversed the Second Circuit's holding of non-infringement. Regardless of the genuineness of the face powder sold under the JAVA trademark in France, and its identity in composition to that sold by the U.S. trademark owner, sales by Katzel of the "genuine" article under the JAVA trademark could be enjoined in the United States because, as stated in the Court's opinion, the trademark JAVA "indicates in law, and, it is found, by public understanding, that the goods come from the plaintiff." 260 U.S. at 692, 43 S.Ct. at 245. Since the goods which defendant was selling did not "come from" the plaintiff Bourjois in the sense of sponsorship, while the public would attribute such goods to the plaintiff, defendant's sales of face powder under the JAVA mark infringed plaintiff's rights. Thus, the Court repudiated several defenses asserted to trademark infringement: (1) that the use of the trademark of Bourjois without its consent was justified because the goods sold under the mark were identical to those of the trademark owner, indeed, were obtained from the same manufacturer, and (2) that the legality of use of the trademark in the country where the importer had obtained the goods justified its concurrent use in this country.[17] The decision followed the generally accepted theory that the function of a trademark is to identify the producer, the source which stands behind the goods sold under the mark, and not the product itself. Bourjois (NY) did not stand behind the goods sold by Katzel, whereas purchasers would think that it did.

The Supreme Court did not mention the § 27 exclusion provision of the trademark statute in *Katzel* since it was not an issue directly raised in that case. However, the question of exclusion by Customs under § 27 arose shortly thereafter in *A. Bourjois & Co., Inc. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923). The underlying facts of *Aldridge* closely parallel those in *Katzel,* except that the trademark involved was MANON LESCAUT for face powder, another mark Bourjois (NY) had acquired from Wertheimer. Unlike *Katzel,* this time Bourjois sought relief against the Collector of Customs (Aldridge) at the port of New York under § 27 of the trademark statute, as well as against the importer, Le Benart Import Co. The district court refused to grant an injunction to require Customs to bar MANON LESCAUT powder (acquired abroad from Wertheimer) from entry by the importer. On appeal, the Second Circuit certified the following two questions to the Supreme Court:

(1) Is the sale in the United States of Wertheimer's Manon Lescaut powder an infringement of plaintiff's registered trade-marks?

(2) Is the collector, by section 27 of the Trade-Mark Law, required to exclude from entry genuine Manon Lescaut powder so as aforesaid made in France?

*A. Bourjois & Co., Inc. v. Aldridge,* 292 Fed. 1013, 1014 (2d Cir.1922).

In a memorandum opinion, the Supreme Court answered both questions in the affirmative, "upon the authority of *A. Bourjois v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464, the defendant [Aldridge] not objecting." Again, infringement was found with respect to arguably "genuine" goods. Not only was the product identical to that of the U.S. trademark owner sold under the

---

17. The court also rejected the argument that the display of the respective company names (Bourjois vis-a-vis Wertheimer) on the labelling precluded confusion of the public. The decision was unanimous and one of Justice Holmes' admirably short opinions of less than three pages. The author of this opinion is embarrassed by any comparison.

same mark, indeed, obtained from the same manufacturer, but also the product was legally sold under the mark at the place of origin and purchase. Nevertheless, Customs was directed to exclude this type of "genuine" goods under § 27.

It is argued that had the Supreme Court decision in the *Katzel* case been handed down sooner, § 1526 would not have been enacted. However, the statute was enacted, and, as the discussion above indicates, it resulted in a statutory bar not limited to the facts of *Katzel,* indeed, not intended to be limited to technical determinations of infringement.

A contemporary judicial assessment of congressional intent is found in *Sturges v. Clark D. Pease, Inc.,* 48 F.2d 1035, 1036 (2d Cir.1931), a case in which the plaintiff sought to import for personal use a second-hand Hispano-Suiza automobile which bore the trademark "H–S." The U.S. rights in that mark had been acquired by Pease, who refused to allow the "genuine" article to be imported. Judge A. Hand, addressing the argument that § 1526 should be narrowly construed, since it would not have been enacted at all had *Katzel* been decided prior thereto, stated:

> But this fact does not settle the scope of the act.
>
> ... The object of this drastic statute is to protect the owner of a foreign trade-mark from competition in respect to goods bearing the mark.... Sales of cars bearing the foreign trade-mark and imported without the consent of Clarke D. Pease, Inc., interfere with its right to control the use of the mark in this country which was the apparent purpose of the congressional legislation.
>
> ... Buyers are likely to purchase Hispano-Suiza cars from Clarke D. Pease, Inc., in order to secure the mark if they cannot otherwise obtain that advantage. If they are allowed to import for personal use without its consent, Clarke D. Pease, Inc., may certainly lose customers who would be willing to buy from them rather than possess cars bearing no

trade-mark. To obtain such advantages the local owner of the foreign mark is given control of the importation of all cars bearing it.

48 F.2d at 1037.

It seems quite clear that Judge Hand did not consider that the statute was limited in scope to the facts of *Katzel.* In his view, the statute was "drastic" in that it gave a trademark owner the right to "control" imports of "all" goods bearing the mark to which it owned U.S. rights, regardless of the relationship between the U.S. trademark owner and the foreign producer.

Despite the reversal of *Katzel* and the holding in *Aldridge* by the Supreme Court, which it is argued made § 1526 unnecessary, the provision has not been nullified, but has remained part of the customs law. Indeed, a proposal to eliminate § 1526 from the customs law, because the Trademark Act of 1946 would carry § 27 forward as part of the new statute, was unsuccessful.[18]

We conclude that no limitations, based on indications of congressional intent at the time of enactment, can be read into the statute itself.

### B.

#### *Administrative Interpretation*

■ Turning to the government's second argument, it is urged that the current Customs regulations reflect a long standing administrative interpretation of the statutory provision and, thus, should be accepted as controlling on this issue. Our review of the series of regulations issued by Customs since 1923, together with administrative practice, Treasury rulings, and correspondence between various Customs officials and members of Congress, indicates that Customs has had and continues to have changing views *of the role of Customs* in enforcing § 1526(a) on behalf of owners of registered U.S. trademarks (as well as in enforcing the import exclusion in the Trademark Acts of 1905 and 1946).

---

**18.** Old § 27 became § 42 (15 U.S.C. § 1124) in the 1946 statute.

The first regulations following enactment of § 1526 were issued by Customs in 1923. As noted in Judge Restani's opinion, these regulations offer little insight into the agency's interpretation, in that they merely recognized that U.S. owners of registered trademarks were entitled to the protection of § 1526. (Customs Regulations of 1923, Articles 475–480.) Upon reenactment of § 1526 as part of the Tariff Act of 1930,[19] new regulations were issued as follows:

> Prohibition of entry.—Entry is prohibited of imported merchandise *bearing a genuine trade-mark* when such trade-mark is recorded with the Treasury Department and registered under the trademark law of February 20, 1905, if compliance is had with all provisions of section 526 of the tariff act of 1930, provided the period of protection for such trade-mark has not expired. [Emphasis added.]

Customs Regulations of 1931, Article 513(a). The bar against goods with "genuine" marks appears to have been considered at that time, by Customs, to be absolute. Without the U.S. trademark owner's consent, all goods, even with "genuine" marks, were barred. *Sturges, supra.*

The first inroad on that concept is found in the 1936 regulations. It must first be noted that Customs regulations have dealt with exclusions based on trademarks in a single set of regulations, whether under § 1526 or under the trademark statute. In the 1936 regulations, goods barred under § 1526 were stated to be deemed for purposes of the regulations to bear a trademark which "copies or simulates" a protected trademark (language taken from the trademark statute). Imported goods were no longer subject to either the trademark or customs law prohibition in the absence of the trademark owner's consent "if such foreign trade-mark ... and such United States trade-mark ... are owned by the same person, partnership, association, or corporation."

In 1953, Customs put into the regulations a much broader limitation under 19 C.F.R. § 11.14. Importation was no longer to be barred by Customs in the absence of the trademark owner's consent if the foreign trademark was owned by a "related company" (as defined in § 45 of the Trademark Act of 1946) of the U.S. owner, and disclosure of such related companies was required. The definition in § 45 (15 U.S.C. § 1127) covers *licensees* as well as commonly owned companies.[20]

Despite these regulations, some U.S. trademark owners continued to enjoy the exclusion of imports of "genuine" goods from abroad apparently by reason of earlier recordation of a mark before disclosure of affiliates was required. Such a situation was revealed in *United States v. Guerlain, Inc.,* 155 F.Supp. 77, 114 USPQ 223 (S.D.N.Y.1957). A U.S. distributor, Guerlain, had utilized the exclusionary provisions of § 1526(a) to prevent importation by others of the same goods which Guerlain was importing. In the district court, the United States successfully maintained that Guerlain's action was in violation of § 2 of the Sherman Act by monopolizing or attempting to monopolize the goods sold under the

---

**19.** The following remarks of Senator Reed at that time are relied on by the government as indicating Congress' understanding of the provision:

> At the present time the tariff laws forbid the importation of an article bearing a trademark registered in America unless the owner of that trade-mark consents in writing to the importation. Obviously the purpose of that provision is to protect the American owner of the trade-mark against importations of articles which have been stamped with his mark *without his consent.* [Emphasis added.]

71 Cong.Rec. 3873 (1929).

We think this remark is ambiguous at best and of little significance to this case. "[W]ithout his consent" could depend from either "importations" or "stamped," which changes the meaning completely.

**20.** 15 U.S.C. § 1127 defines related company as follows:

> The term "related company" means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used.

trademark, i.e., intrabrand competition in the subject goods was prevented.[21] Had this ruling stood, Vivitar would not be advancing the interpretation of § 1526 which it is urging today. However, during the pendency of the case before the Supreme Court, the Justice Department moved to vacate the judgments of the district court in its favor to enable it to move in that court to dismiss. As reasons for such action, the government stated that it was *the practice of Customs* to allow such exclusions of "genuine" goods and that the government would seek legislation to clarify that the products of an affiliate of the U.S. trademark owner were not subject to the exclusion remedy. The Supreme Court granted the government's motion. 358 U.S. 915 (1958). Efforts to obtain such legislation proved unfruitful. *See* H.R. 7234, 86th Cong., 1st Sess. (1959).

In 1959, apparently as a result of the *Guerlain* situation, Customs expressly went back to the more limited 1936 exception, i.e., importation was allowed without consent only if the "same entity" owned rights here and abroad. *See* J.F. Atwood, *Import Restrictions on Trademarked Merchandise—The Role of the United States Bureau of Customs*, 59 Trademark Reporter 301, 307 (1969). It appears from Treasury Decision T.D. 69–12(2) (1969) in the record, however, that the "same entity" requirement was satisfied, in the view of Customs, by a parent/subsidiary relationship. However, disclosure of foreign relationship was not required in the 1959 regulations except for principal and agent, 19 C.F.R. § 11.15(a) (1959), so that Customs could not uniformly enforce the limitations.

In 1972, the regulations were again revised. The new regulations, 19 C.F.R. § 133.21, carried forward the "same entity" limitation and added limitations explicitly for (1) parent/subsidiary corporations and other common ownership of the owners of the foreign and U.S. trademarks (§ 133.-21(c)(2)) and (2) foreign licensees of the

U.S. company which is the owner of a U.S. trademark (§ 133.21(c)(3)). (The regulation does not distinguish between a licensee of U.S. rights or foreign rights). Disclosure of these names is required.

With respect to actual administration practice, during some years Customs acted to exclude goods which, under its regulations, should not have been excluded because it lacked information to implement its regulations. Thus, trademark recordants prior to 1953 were treated differently from recordants between 1953–1959 and those after 1959 differently from those before that date. Whether earlier recordants are not treated the same today as those after 1972, we do not know. In the above cited article by J.F. Atwood, a customs law specialist at the then Bureau of Customs, the problem of lack of uniform administration is discussed. 59 Trademark Reporter at 310–11. One section is entitled "The Related Company Riddle" and concludes with the statement:

Thus related companies are no longer denied full protection merely because they are affiliated with a foreign firm, or because control as to the nature and quality of the trademark [sic, goods sold under trademark] is exercised, but only because there is common ownership or control.

59 Trademark Reporter at 317. Work on clarifying the position of Customs with respect to bars against related companies was proceeding at that time (1969).

Similarly, a comprehensive study is being made at this time with respect to genuine goods in the grey market. *See* Solicitation of Economic Data Notice, 49 Fed.Reg. 21,-453–56 (1984). As stated therein:

Because of the controversy and considerable interest on both sides of the issue expressed in many letters to, and requests for meetings with, the Executive Branch Departments and Agencies, the Cabinet Council on Commerce and Trade's [CCCT] Working Group on Intel-

---

**21.** Two other defendants were similarly charged with respect to other goods and marks. The cases were consolidated because of the common issue. There was no charge of conspiracy among the defendants.

lectual Property [WGIP] is studying the issues relating to parallel imports. The WGIP may make a recommendation to the CCCT with respect to parallel imports of trademark products when it concludes its study.

While the notice does not propose new regulations, we discern a continued uncertainty within the executive branch as to the meaning of the exclusion provisions.

Finally, we note that Customs joined with the Department of Justice in filing an amicus brief in 1983 in another "grey market" goods case entitled *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2d Cir.1983), in which the government urged the court to construe § 1526(a) "in accord with the normal meaning of the statutory language" and repudiated the position urged here.

While the government has cited other official or semi-official statements of Customs' interpretation of § 1526(a), we do not see that these materials help its "long standing administration" argument here. Rather than a consistent policy of administration over the years, reflecting an unvarying interpretation of the statute, it appears that Customs has had continuing questions concerning the reading of the statute. It is evident that, over the years, Customs has attempted to adjust its regulations to reflect the few judicial decisions which interpreted the law prior to 1972. The regulations, while imposing the "same entity" limitation since 1936, have not been consistent in respect of what other limitations should be recognized nor has consistency been unequivocally shown in enforcement. Thus, like the legislative history argument, the "long standing administrative interpretation" argument of the government and intervenor does not afford a basis for a definitive statutory interpretation.

## C.

### *Implied Ratification*

■ Finally, the government argues that Congress has ratified the interpretation given to the statute by the Customs regulations. As early as 1954, Treasury informed Congress that the overlap of 19 U.S.C. § 1526 and 15 U.S.C. § 1124 "was confusing," and that a proposed amendment of § 1526 to specify that exclusion was not authorized with respect to commonly owned companies, agents, licensees, etc., would endorse Customs' interpretation. The amendment was not passed.

In 1978, Congress did amend § 1526 to add an exemption from the statutory bar against importation with respect to goods accompanying travellers for personal use (19 U.S.C. § 1526(d)). The House Report (H.R.Rep. 521, 95th Cong. 1st Sess. 27 (1977)) states, albeit incorrectly, that the Customs Service had consistently interpreted § 1526 as not encompassing imports which were authorized by the U.S. trademark owner to be produced abroad. Nothing in any materials we have been able to find indicates in any way that the limitations set forth in the Customs regulations were endorsed or incorporated into the statute. Several problems concerning individual travellers were being addressed, of which the bar to bringing in "genuine" goods for personal use was one of the most annoying.

From these events, appellees argue that Congress must be deemed to have, in effect, incorporated the limitations of the 1972 regulations into the statute because it was aware of them. We cannot agree. Legislation by total silence is too tenuous a theory to merit extended discussion.

## IV.

### *Interrelationship of Statute and Regulations*

Vivitar attacks the regulations as contrary to § 1526(a) and, therefore, invalid. In Vivitar's view, the statute, but not the regulations, provides an absolute bar to importation of goods manufactured abroad which bear a trademark identical to one registered in the U.S. by a U.S. entity unless the latter consents. Thus, per Vivitar, the regulations unlawfully limit the

rights of the trademark owner given by the statute.

It appears that Vivitar's position is based on an erroneous understanding as to the structure of the statute and the nature of the subject regulations. Vivitar's arguments are premised on the assumption that the regulations set the limits of its right to exclude under § 1526(a). This premise erroneously treats the regulations as *legislative* rules having the force of law. Congress may, of course, entrust an agency with the duty to exercise its judgment under guidelines set forth in a statute, and to fill in the extent of protection thereunder. *See, e.g., Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). However, we find no language in the statute by which Congress delegated such *legislative* authority to the Secretary of Treasury in connection with administration of § 1526(a).[22] Without such authority, Customs regulations cannot affect the actual scope of a trademark owner's rights vis-a-vis an importer under the statute. *See* 2 K. Davis, *Administrative Law Treatise* § 7.8 (2d ed. 1979).

Regardless of whether Customs excludes or does not exclude particular imports, the courts must independently determine whether the importation is or is not precluded by the statute. In connection with exclusion under the trademark statute (15 U.S.C. § 1124), Customs' administrative determination that importations bear a mark that is not likely to cause confusion with a recorded mark has no effect on a trademark owner's right to obtain a judicial determination of infringement and, thereafter, to have such goods excluded (or vice versa). *See La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc.*, 495 F.2d 1265, 181 USPQ 545 (2d Cir.1974); *Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 566 F.Supp. 1523 (1983) (injunction granted against exclusion pending determination of infringement in district court); *Holland v. C. & A. Import Corp.*, 8 F.Supp. 259, 261 (S.D.N.Y.1934); *see also Humble Oil & Refining Co. v. Sekisui Chemical Co.*, 165 USPQ 597, 604–605 (TTAB 1970) (Customs defers to decision of TTAB or other tribunal). Similarly, Customs' decision, as expressed in the subject regulations, not to exclude grey market goods does not control on the question of whether particular goods should or should not be excluded. A trademark owner is entitled, as in the "confusingly similar" mark case, to pursue private remedies against the importer and, if successful, to have such grey market goods excluded.[23]

With these considerations in mind, we conclude that the regulations do no more than define Customs' role in initiating administrative enforcement of the statute. Viewed in this manner, it is apparent that the regulations are not *contrary* to the statute in the sense that goods are being routinely excluded which should be admitted or *vice versa*. Nor has any instance been brought to our attention where, after a judicial determination that imports should be excluded, Customs refused thereafter to undertake to act accordingly. Vivitar's complaint is simply that the regulations do not go far enough in automatically excluding all types of grey market importations.

In our view, Customs is not required to exclude all grey market goods *sua sponte*.

---

**22.** The regulations were issued pursuant to general authority under 19 U.S.C. § 1624. In contrast, § 1526(d)(2) contains a specific delegation of legislative type authority to the Secretary with respect to importations for personal use and specific authority to issue regulations in § 1526(d)(4). In some instances legislative authority may be found without a specific grant if it is clear from "the language and logic of the [statute] and its legislative history" that such authority was contemplated. *Chrysler Corp. v. Brown*, 441 U.S. 281, 308, 99 S.Ct. 1705, 1720, 60 L.Ed.2d 208 (1979).

**23.** If we turn to regulations of Customs related to other statutory exclusions, the non-legislative nature of all of these regulations becomes readily apparent. Trade names (i.e. company names) may be recorded only if used for six months. Nothing in 15 U.S.C. § 1124 establishes this requirement. No automatic exclusion is provided at all pursuant to 15 U.S.C. § 1125(b) which relates to unfair competition cases (§ 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)).

Congress could not have foreseen all possibilities in international trade relationships at the time of enacting the statute. The variations of the grey market are myriad.[24] While we have rejected the government's argument that the statute must be interpreted as limited by the regulations, we must also reject the view that the statute may not have *any* implied limitations or that general principles such as "agency," "piercing the corporate veil," "sham" transactions, "estoppel," "fraud" or other defenses could not defeat an apparent right to invoke the statute.

■ In any event, if we return to the statute, U.S. trademark owners are provided therein essentially with a private remedy, which is properly being tested in the federal district courts with increasing frequency and where issues, such as those raised above, are being resolved. It appears to us that § 1526(a) may be developing on a case-by-case basis into protection against *sui generis* types of unfair competition in international trade.[25] That Customs regulations do not provide for exclusion initially in a case where the trademark owner ultimately prevails in federal district court does not mean that regulations must be declared invalid. Where protection under the statute is unclear or depends upon resolution of complex factual situations, Customs may decline to impose *sua sponte* the extreme sanction of exclusion and leave

such cases for initial determination by the district courts under the private remedies provided to the trademark owner in § 1526(c).[26] Indeed, the fact that the trademark owner is provided with the remedies of injunction and damages against private parties who have improperly dealt in the goods in the United States negates the idea that agency-initiated action in all cases is expected. Further, the absence of a provision for expeditious relief and monetary compensation for an importer whose goods are improperly excluded cautions against automatic administrative exclusion in such cases.[27]

■ Accordingly, we hold the current regulations to be valid but not controlling with respect to the scope of protection of 19 U.S.C. § 1526(a). To obtain any additional protection, Vivitar must first pursue a determination of its alleged rights against persons engaging in parallel importation of VIVITAR photographic equipment in federal district court, and, if successful, is entitled to have the parallel imports excluded by Customs.

### Conclusion

We conclude that the Court of International Trade had exclusive jurisdiction to determine the validity of the current regulations administering 19 U.S.C. § 1526(a). We further conclude that the scope of the statutory protection afforded to a U.S.

24. For example, the U.S. and foreign trademark rights may be owned by the same entity or by related companies, or by wholly separate companies. The goods of the U.S. owner may be imported and may be identical to, or different from, the parallel import. Goods may be produced in the U.S. by the U.S. trademark owner and different goods produced abroad by the U.S. owner or by its affiliate. Services and warranties may or may not be the same here and abroad. A foreign licensee (i.e., related company) may be required by foreign law and may not be subject to meaningful control by the U.S. owner. A number of such actual variations are indicated by the cases cited in this opinion; others are discussed in Takamatsu, *Parallel Importation of Trademarked Goods: A Comparative Analysis*, 5 Wash.L.Rev. 433 (1982).

25. *Selchow & Righter Co. v. Godex Corp.*, No. 84–8264 (S.D.Fla.1985); *Osawa & Co. v. B. & H.*

*Photo*, 589 F.Supp. 1163, 223 USPQ 124 (S.D.N.Y.1984); *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 548 F.Supp. 1063, 215 USPQ 870 (E.D.N.Y.1982), *Parfums Stern, Inc. v. Customs Service*, 575 F.Supp. 416 (S.D.Fla.1983); *Model Rectifier Corp. v. Takachiho Int'l, Inc.*, 709 F.2d 1517, 221 USPQ 502 (9th Cir.1983).

26. *See Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 244, 566 F.Supp. 1523, 1528 (1983) ("judicial expertise ... is clearly in the District Court.").

27. *Cf.* 19 C.F.R. § 133.43 (copyright exclusion regulations which require, *inter alia*, U.S. copyright owner to post a bond conditioned to hold the importer or owner of the imported articles harmless from any loss or damage resulting from Customs detention).

trademark owner under 19 U.S.C. § 1526 is not fixed by the Customs regulations. The regulations, 19 C.F.R. § 133.21, are upheld as a reasonable exercise of administratively initiated enforcement. The judgment of the Court of International Trade is *affirmed.*

AFFIRMED.

### APPENDIX

### § 1526. Merchandise bearing American trade-mark

#### (a) Importation prohibited

Except as provided in subsection (d) of this section, it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said title 15, unless written consent of the owner of such trademark is produced at the time of making entry.

#### (b) Seizure and forfeiture

Any such merchandise imported into the United States in violation of the provisions of this section shall be subject to seizure and forfeiture for violation of the customs laws.

#### (c) Injunction and damages

Any person dealing in any such merchandise may be enjoined from dealing therein within the United States or may be required to export or destroy such merchandise or to remove or obliterate such trademark and shall be liable for the same damages and profits provided for wrongful use of a trade-mark, under the provisions of sections 81 to 109 of title 15.

#### (d) Exemptions; publication in Federal Register; forfeitures; rules and regulations

(1) The trademark provisions of this section and section 1124 of title 15, do not apply to the importation of articles accompanying any person arriving in the United States when such articles are for his personal use and not for sale if (A) such articles are within the limits of types and quantities determined by the Secretary pursuant to paragraph (2) of this subsection, and (B) such person has not been granted an exemption under this subsection within thirty days immediately preceding his arrival.

(2) The Secretary shall determine and publish in the Federal Register lists of the types of articles and the quantities of each which shall be entitled to the exemption provided by this subsection. In determining such quantities of particular types of trade-marked articles, the Secretary shall give such consideration as he deems necessary to the numbers of such articles usually purchased at retail for personal use.

(3) If any article which has been exempted from the restrictions on importation of the trade-mark laws under this subsection is sold within one year after the date of importation, such article, or its value (to be recovered from the importer), is subject to forfeiture. A sale pursuant to a judicial order or in liquidation of the estate of a decedent is not subject to the provisions of this paragraph.

(4) The Secretary may prescribe such rules and regulations as may be necessary to carry out the provisions of this subsection.

#### (e) Merchandise bearing counterfeit mark; seizure and forfeiture; disposition of seized goods

Any such merchandise bearing a counterfeit mark (within the meaning of section 1127 of title 15) imported into the United States in violation of the provisions of section 1124 of title 15, shall be seized and, in the absence of the written consent of the trademark owner, forfeit-

ed for violations of the customs laws. Upon seizure of such merchandise, the Secretary shall notify the owner of the trademark, and shall, after forfeiture, obliterate the trademark where feasible and dispose of the goods seized—

(1) by delivery to such Federal, State, and local government agencies as in the opinion of the Secretary have a need for such merchandise,

(2) by gift to such eleemosynary institutions as in the opinion of the Secretary have a need for such merchandise.

(3) more than 1 year after the date of forfeiture, by sale by appropriate customs officers at public auction under such regulations as the Secretary prescribes, except that before making any such sale the Secretary shall determine that no Federal, State, or local government agency or eleemosynary institution has established a need for such merchandise under paragraph (1) or (2), or

(4) if the merchandise is unsafe or a hazard to health, by destruction.

DAVIS, Circuit Judge, concurring in the result.

On the jurisdiction of the Court of International Trade (CIT), I agree with the court's opinion, adding only the citation of *American Association of Exporters v. United States*, 751 F.2d 1239, 1244–46 (Fed.Cir.1985), a recent decision of this court plowing much of the ground of the CIT's current power.

On the merits, I agree with the majority that the challenged Customs regulation is valid because Customs could properly, for its own administrative and enforcement purposes, provide that it would exclude less than all the trademarked goods that *might* turn out to be covered by § 1526(a), *i.e.*, that Custom's own enforcement need not be coterminous with the full reach of that statute as it applies between private persons. Unlike the majority, I find that since 1936 the Customs regulations have been substantially consistent as they apply to imported goods comparable to those Vivitar says should be excluded in its case.

I do not join the court's opinion mainly because I think it is wholly inappropriate for this court to go further and to delve (as it does extensively in Part III of the majority opinion) into bases for construing § 1526(a) as that legislation applies between private parties. That type of discussion should be left to the district courts and the regional courts of appeals when they are faced with a suit (under 19 U.S.C. § 1526(c), 28 U.S.C. §§ 1331 and 1338) by the trademark owner against persons dealing in this country in merchandise said to have been imported in violation of § 1526(a). The CIT will never deal with those private-party suits and issues, and this court can reach them only if they happen to be joined with an appealed patent claim. 28 U.S.C. § 1295(a)(1). To me, it is needless and gratuitous for this court, in this international trade case coming from the CIT, to indulge in lengthy dicta bearing on the full scope of § 1526(a), *obiter dicta* which will not bind any court in a private suit but which simply tends to confuse the trademark bar.

I certainly agree that we should make it clear that the Customs regulation does not *necessarily* cover the full sweep of § 1526(a), but it is not for us to indicate affirmatively (as the majority does), even in dicta, that that full sweep is actually wider than the regulation. The entire matter should be left to further litigation with which we can only be haphazardly concerned, if at all. All that we *hold* in this case is that the Customs regulation is now valid as a Customs enforcement regulation. That is quite enough.