**OLYMPUS CORPORATION,**
Plaintiff-Appellant,

v.

**UNITED STATES, et al.,**
Defendants-Appellees,

**K Mart Corporation,**
Intervenor-Appellee,

**47th Street Photo, Inc.,**
Intervenor-Appellee.

No. 733, Docket 85–6282.

United States Court of Appeals,
Second Circuit.

Argued Jan. 28, 1986.
Decided June 9, 1986.

Max F. Schutzman, New York City (Whitman & Ransom, John M. Hadlock, New York City, of counsel), for plaintiff-appellant.

David M. Cohen, Washington, D.C. (Richard K. Willard, Asst. Atty. Gen., Velta A. Melnbrencis, Civ. Div., Dept. of Justice, Alfonso Robles, U.S. Customs Service, Washington, D.C., of counsel), for defendants-appellees.

Robert W. Steele, Washington, D.C. (Robert E. Hebda, Steele, Simmons & Fornaciari, Washington, D.C., James C. Tuttle, Asst. Gen. Counsel, K Mart Corporation, Troy, MI, of counsel), for intervenor-appellee K Mart Corp.

Nathan Lewin, Washington, D.C. (Jamie S. Gorelick, Rory K. Little, Miller, Cassidy, Larroca & Lewin, Washington, D.C., of counsel), for intervenor-appellee 47th Street Photo, Inc.

Before OAKES, WINTER and PRATT, Circuit Judges.

OAKES, Circuit Judge:

After extended but unsuccessful trade association efforts to secure change of United States Customs Service regulations permitting parallel importation of "gray market" goods, an American subsidiary of a foreign manufacturer of trademarked goods seeks declaratory and injunctive relief declaring those Customs regulations invalid. Such relief was also sought but denied by the Court of International Trade ("CIT") in *Vivitar Corp. v. United States*, 593 F.Supp. 420 (Ct.Int'l Trade 1984), *aff'd*, 761 F.2d 1552 (Fed.Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986) (*"Vivitar"*), but was granted by the United States Court of Appeals for the District of Columbia Circuit in *Coalition to Preserve the Integrity of American Trademarks v. United States*, 790 F.2d 903 (D.C. Cir.1986) (*"COPIAT"*), reversing 598 F.Supp. 844 (D.D.C.1984). The United States District Court for the Eastern District of New York, Charles P. Sifton, Judge, in an opinion published at 627 F.Supp. 911 (E.D.N.Y.1985), agreed with the district court in *COPIAT* and the CIT in *Vivitar* that the regulations were not contrary to the statute in question, section 526 of the Tariff Act of 1922, ch. 356, 42 Stat. 858, 975, reenacted without significant change in the Tariff Act of 1930, ch. 497, § 526, 46 Stat. 590, 741 (codified as amended at 19 U.S.C. § 1526 (1982)) ("Section 526"). On appeal intervenor-appellee 47th Street Photo urges that the district court had no subject matter jurisdiction on the basis that the CIT has exclusive jurisdiction over the Tariff Act claim. We find, however, that the district court properly asserted jurisdiction over the dispute. We agree with the district court that the Customs regulation is valid. And we affirm the district court's holding that appellant failed to state a claim under section 42 of the Lanham Act, 15 U.S.C. § 1124 (1982).

## Background

Olympus Corporation ("Olympus") is a New York wholly-owned subsidiary of Olympus Optical Company, Ltd. ("Olympus Optical"), a Japanese corporation that manufactures Olympus-brand products, including cameras, lenses, flash units, and filters. Olympus is the exclusive distributor of Olympus Optical's Japanese-manufactured goods in the United States, and it owns the rights in this country to the Olympus trademark. 47th Street Photo, Inc., is a New York City retailer of electronic equipment, including Olympus Optical products. Some of those Olympus Optical goods are purchased abroad, evidently at prices that permit 47th Street Photo to offer the goods for resale in its stores at discount prices. The goods bear the Olympus mark. K mart Corporation is a national retailer operating more than 2,000 stores, and is a potential customer for such gray market Olympus-brand equipment. It deals substantially in other gray market goods. Gray market goods, such as the Olympus-brand goods that 47th Street Photo sells, and K mart may potentially sell, are goods that are manufactured abroad, are legally purchased abroad from authorized distributors, and are then imported by persons other than the trademark holder and without the markholder's permission. Gray market goods are thus imported "parallel" to goods imported by or with the permission of the markholder.

Section 526(a) makes it "unlawful to import into the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States," provided that the trademark is properly registered, as the Olympus trademark was here, "unless written consent of the owner of such trademark is produced at the time of making entry." 19 U.S.C. § 1526(a) (1982). Section 526(b) subjects any such merchandise to seizure and forfeiture for violation of the customs laws. Section 526(c) provides that any person dealing in such merchandise may be enjoined from doing so or may be required to export or destroy the merchandise or remove or obliterate the trademark; it also subjects the dealer to the same liability for damages and profits as for wrongful use of a trademark.

The applicable Customs regulation excepts from Customs seizure under section 526 imported articles bearing a trademark identical to the one held by a United States citizen or corporation when "[t]he foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control." 19 C.F.R. § 133.21(c)(2) (1985). The effect of this regulation is to allow third parties to import trademarked goods without the permission of the American markholder where that markholder is either a parent or subsidiary of, or is held in common ownership with, a foreign manufacturer.

The American Association of Exporters and Importers, acting through a trademark group, the chairman of which is the vice president in charge of product importation of Olympus, sought to have the Customs Service and the Treasury Department eliminate from the regulations the exemption under section 133.21(c)(2). As a letter dated June 8, 1984, makes clear, however, "[b]ecause of the legislative and litigative history and longstanding Customs practice on this matter, the Treasury Department has declined to change this practice by a mere regulatory change." Letter from John M. Walker, Jr., Assistant Secretary (Enforcement and Operations), Department of the Treasury, to Senator Paul S. Sarbanes. Having failed in its efforts to obtain regulatory reform, Olympus began this litigation.

## Discussion

### I. JURISDICTION

In *Vivitar Corp. v. United States*, 585 F.Supp. 1419 (Ct. Int'l Trade 1984), *aff'd*, 761 F.2d 1552 (Fed.Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986), Judge Restani held that the CIT had exclusive jurisdiction over a suit addressing

the same issue raised here because the cause of action arises out of the laws of international trade, that jurisdiction being based on 28 U.S.C. § 1581(i)(3) and (4) (1982). The D.C. Circuit in *COPIAT*, 790 F.2d 903, 905–907 (D.C.Cir.1986), and the district court in this case, No. CV–84–0920 (E.D.N.Y. Nov. 15, 1984) (unpublished order), rejected the claim that jurisdiction over this matter belongs exclusively in the CIT. The Court of Appeals for the Federal Circuit, however, affirmed the CIT's holding that an action for a declaratory judgment that 19 C.F.R. § 133.21 was invalid falls within the exclusive jurisdiction of the CIT either under 28 U.S.C. § 1581(i)(4) as relating to the administration and enforcement of the so-called "protest" jurisdiction in 28 U.S.C. § 1581(a), or under 28 U.S.C. § 1581(i)(3) as a civil action against the United States arising out of laws providing for an embargo or quantitative restriction on goods, and the administration and enforcement thereof, 28 U.S.C. § 1581(i)(4), 761 F.2d at 1560. We disagree.

■■■ Congress has granted the CIT exclusive jurisdiction over actions specified in 28 U.S.C. § 1581(a)–(h), and provided in 28 U.S.C. § 1581(i) for a residual grant of exclusive jurisdiction. *See generally* Amerine, *Jurisdiction of the Court of International Trade: One Year After the Customs Courts Act of 1980*, 29 Fed.B.News & J. 43 (1982). Under section 1581(i)(4) jurisdiction is conferred over any civil action "that arises out of any law of the United States providing for . . . administration and enforcement with respect to the matters referred to in . . . subsections (a)–(h)" of section 1581. Section 1581(a) refers to review of the denial of protests under 19 U.S.C. § 1515. However, section 1514, which outlines the circumstances under which a protest may be made, makes no provision for a protest where the Customs Service *refuses* to exclude merchandise; it permits the filing of a protest only when exclusion of merchandise takes place under a provision of the customs law. 19 U.S.C. § 1514(a)(4) (1982 & Supp. II 1984). Here, the goods have not been excluded and a markholder challenging their importation

therefore can file no protest. *See Vivitar*, 585 F.Supp. at 1424 ("19 U.S.C. § 1514 makes it clear that a decision not to exclude merchandise is not protestable.").

Judge Restani, however, found that section 1581(i)(4) gave the CIT jurisdiction of the substantive matter that may be the subject of a protest where the protest remedy is inappropriate or unavailable. *Id.* at 1425. Although section 1581(i) was intended as a broad grant of jurisdiction to the CIT, *see* H.R.Rep. No. 1235, 96th Cong., 2d Sess. 47 ("House Report"), *reprinted in* 1980 U.S.Code Cong. & Ad.News 3729, 3759, this action does not arise out of the "administration and enforcement" of protests simply because it tangentially relates to the protest procedure. We think that section 1581(i)(4) properly gives the CIT jurisdiction only of those matters that arise from protests themselves, not of all issues that conceivably could arise in a protest action under a hypothetical fact situation. CIT jurisdiction over this case will not further the congressional purpose of achieving uniform decision-making with respect to import transactions by referring disputes to a court possessing specialized expertise, *see* House Report at 20, 1980 U.S.Code Cong. & Ad.News at 3731, because this action primarily involves antitrust and trademark matters, areas outside the expertise of the CIT. Because we decide that section 1581(i)(4) in conjunction with section 1581(a) does not give the CIT jurisdiction over this matter, we need not reach the Government's broader contention that there can be no protest jurisdiction with respect to these matters because section 526 is a trademark law and not a customs law within the meaning of 19 U.S.C. § 1514(a)(4).

■■■ The Federal Circuit held, alternatively, that the CIT had jurisdiction over *Vivitar* pursuant to 28 U.S.C. § 1581(i)(3) because the case arises out of an "embargo or quantitative restriction on certain goods," 761 F.2d at 1560 (footnote omitted), section 526 being a law providing for a quantitative restriction of zero. But we do

not think this is the kind of case Congress envisioned when it passed section 1581(i)(3). Rather, we think quantitative restrictions refer to numerical import restrictions such as those imposed by quotas. *See American Association of Exporters & Importers v. United States*, 751 F.2d 1239, 1244 (Fed. Cir.1985) (trade group's suit challenging government action establishing textile import quotas properly brought in the CIT under 28 U.S.C. § 1581(i)(3)). The reference by Senator Kellogg, an opponent of section 526, to that section in the 1922 Senate debate as a proposal "to enforce the trademark laws by a prohibition and an embargo against shipments," 62 Cong.Rec. S. 11603 (Aug. 19, 1922), is entitled to little weight. To treat section 526 as an "embargo" would be to give that term a construction far broader than its ordinary meaning without any indication of such congressional intent. The continuing trademark jurisdiction of the district courts under 28 U.S.C. §§ 1331 and 1338(a) (1982) gives the district courts jurisdiction not only over the respective rights between private parties under section 526, *see Vivitar*, 761 F.2d at 1560, but also over the matter presented here.

## II. MERITS

The legislative history of section 526 has been, we think, quite correctly recounted by Judge Restani in *Vivitar*, 593 F.Supp. at 426–28. Little would be gained by adding to what she says there and we adopt that portion of her opinion by reference, noting only that we consider the amendment of section 526 to exempt articles imported by an individual for his own use to be irrelevant here. While we agree with her conclusion that section 526 was adopted in 1922 primarily to overturn a decision of this court, *A. Bourjois & Co. v. Katzel*, 275 F. 539 (2d Cir.1921), a decision that was later reversed by the United States Supreme Court, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), as Judge Leval stated in *Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1175 (S.D.N.Y.1984), "[t]he fact that [section 526] was passed to overturn the Court of Appeals decision in *Katzel* does

not mean that, in spite of its broad language, it should govern only the narrowest version of the *Katzel* facts." Nonetheless we disagree with the broad interpretation the *Osawa* court gave the statute, 589 F.Supp. at 1170–78, for reasons that will appear below.

The checkered history of the Customs regulations embodied principally in 19 C.F.R. § 133.21(c) is set forth by the Court of Appeals for the Federal Circuit in *Vivitar*, 761 F.2d at 1565–68. We disagree with the Federal Circuit's conclusion that the regulations have not been sufficiently consistent to warrant a finding that longstanding administrative interpretation confirms appellees' reading of the statute. We do, however, adopt by reference that court's statement of the factual history of the regulations. So saying, we point to one additional piece of information and add one caveat. The additional information, as set forth in the district court's opinion in *COPIAT*, 598 F.Supp. at 850, is that since 1951 the Customs Service has issued several letters reflecting its consistent policy, in cases in which the United States trademark owner and the owner of the foreign rights to the mark are one and the same person, of permitting the importation by anyone of trademarked goods introduced into commerce by the foreign owner. *See* Customs Service Letters dated March 23, 1951; July 2, 1962; March 19, 1963; December 11, 1968; and June 28, 1971. Our caveat is that we agree in large part with Judge Leval's statements in *Osawa* that section 133.21(c) is "unsound both as antitrust policy and as trademark law," 589 F.Supp. at 1178, especially in respect to his comments on *United States v. Guerlain, Inc.*, 155 F.Supp. 77 (S.D.N.Y.1957), *vacated and remanded*, 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958), *action dismissed*, 172 F.Supp. 107 (S.D.N.Y.1959). *See generally Osawa*, 589 F.Supp. at 1176–78. While the district court's decision in *Guerlain* was subject to criticism, the trend of antitrust law prior to 1972 supported it and the Customs regulations. Indeed, in *United States v. Arnold, Schwinn & Co.*, 388 U.S.

365, 379, 87 S.Ct. 1856, 1865, 18 L.Ed.2d 1249 (1967), the Supreme Court held that manufacturer-imposed restrictions on the distribution of products after those products were released into commerce were per se violations of the Sherman Act. *Schwinn*, however, was, as we know, overruled in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977), and this alone would seem to make reassessment of section 133.21(c) appropriate at least insofar as those regulations rest on antitrust considerations.

■ Here we come to the gist of our decision. While we find the regulation of questionable wisdom, we believe that congressional acquiescence in the longstanding administrative interpretation of the statute legitimates that interpretation as an exercise of Customs' enforcement discretion. The variations of the gray market are numerous. *See Vivitar*, 761 F.2d at 1570 n. 24 (U.S. and foreign trademark rights may be owned by the same entity, by related companies, or by wholly separate companies; imported goods may be identical to or different from the parallel import; the goods may be produced in the United States and different goods produced abroad; services and warranties may or may not be the same; foreign licensees may not be subject to U.S. control). The administrative difficulties inherent in requiring the Customs Service to exclude gray market goods make clear why Customs has long and consistently interpreted section 526 to allow it to refuse to exclude the goods. Absent this bright line for administrative enforcement, the Customs Service would expend resources excluding goods when later private litigation could disclose that the markholder lacked isolable domestic good will and was merely engaging in price discrimination or other behavior questionable as a matter of antitrust law. Regulations that attempted to permit exclusion only of goods the markholders of which possessed discrete domestic good will would, as Judge Sifton pointed out, place the Customs Service "in the position of having to determine at the time of border crossing whether the domestic trademark holder had developed an independent public image in this country." 627 F.Supp. at 921.

■ While there may be a difference between exercising administrative discretion on a case-by-case basis to refuse to undertake enforcement actions, *see, e.g., Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), and promulgating a regulation that ensures potential gray market infringers that they may import goods with impunity, the latter is not the case here. Customs' interpretation of the statute does not limit the reach of protection of section 526; it only limits Customs' obligation to enforce the section by excluding goods. The markholder still has rights under the statute: he may pursue private remedies against the importer under section 526(c), notwithstanding Customs' failure to exclude the goods.

It is this concern for the underlying administrative problems of Customs that we believe must have led Congress to engage in what the district court in *COPIAT* labeled "a pattern of legislative acquiescence," 598 F.Supp. at 851, in reference to Customs' interpretation of section 526. In connection with amending section 526 in the Customs Procedural Reform and Simplification Act of 1978, Pub.L.No. 95–410, § 211, 92 Stat. 888, 903, the House Ways and Means Committee explicitly recognized the Customs Service's then twenty years of consistent interpretation "excluding from protection foreign-produced merchandise bearing a genuine trademark created, owned, and registered by a citizen of the United States if the foreign producer has been authorized by the American trademark owners to produce and sell abroad goods bearing the recorded trademark." H.R.Rep. No. 621, 95th Cong., 1st Sess. 27 (1977). Yet, Congress did not take any action to alter this approach, thus indicating its acceptance of Customs' practice. *See Haig v. Agee*, 453 U.S. 280, 297–98, 101 S.Ct. 2766, 2776–77, 69 L.Ed.2d 640 (1981) (where Congress acts in related area with

awareness of and no evidence of intent to repudiate longstanding administrative construction, Congress is read to have adopted that interpretation); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Grocery Manufacturers of America, Inc. v. Gerace*, 755 F.2d 993, 1000 (2d Cir.) (citing cases), *cert. denied*, —— U.S. ——, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985). Congress was informed that the Customs Service permitted parallel importation when it considered amending the customs law in 1954, *see Registration and Protection of Trademarks: Hearing on S.2540 Before a Subcomm. of the Senate Comm. on the Judiciary*, 83d Cong., 2d Sess. 96 (1954) (letter of Thruston B. Morton, Assistant Secretary of State), and specifically noted the practice and yet chose not to change it while amending other parts of section 526 in 1978. While it may be good policy to change these regulations as argued, *e.g.*, in Note, *The Greying of American Trademarks: The Genuine Goods Exclusion Act and the Incongruity of Customs Regulation 19 C.F.R. § 133.21*, 54 Fordham L.Rev. 83, 111–15 (1985), we believe that in light of the long acceptance of the regulations, change is a matter for the legislative or executive branch and not the judiciary.[1]

■ We think the district court correctly dismissed Olympus's claim under 15 U.S.C. § 1124 (1982). The plain language of the statute does not bar importation if the goods are genuine, only if they "copy or simulate" a trademark. True, the Supreme Court held in *A. Bourjois & Co. v. Aldridge*, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam), by answering affirmatively questions certified at 292 F. 1013, 1014 (2d Cir.1922), that section 27 of the Trade-Mark Law of 1905, from which 15 U.S.C. § 1124 was derived, bars importation of goods produced abroad and bearing the genuine trademark where an independent domestic trademark owner purchased the U.S. trademark rights from the foreign trademark owner. It is difficult to argue that *Aldridge* can be distinguished on the basis that the domestic and foreign markholders there were independent of each other because such an argument suggests that the words "copy or simulate" mean one thing when the companies are related and another when they are not. But the interpretation of section 1124 urged by Olympus puts a great deal of strain on a one-sentence per curiam opinion announcing a decision, to which the opposing party did not object, based on the reasoning of the three-page opinion in *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), a case influenced by equities not present here. Absent the *Katzel* situation, section 1124 applies only to merchandise bearing counterfeit or spurious trademarks that "copy or simulate" genuine trademarks. We are reassured in this conclusion by the fact that in *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924),

1. In *COPIAT*, 790 F.2d 903 (D.C.Cir.1986), the District of Columbia Circuit invalidated the regulations here at issue, holding them inconsistent with Section 526. We disagree with that court's conclusion that "the Customs Service's interpretation of Section 526 does not display the necessary 'thoroughness, validity, and consistency' to merit judicial acceptance," 790 F.2d at 916, *quoting Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), at least in the face of congressional acquiescence in that interpretation. Moreover, we do not think that *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), precludes us from holding the agency's regulation proper as an exercise of enforcement discretion even if the agency did not itself "purport[ ] to justify these regulations as an exercise of enforcement

discretion." *COPIAT*, 790 F.2d at 918. As the earlier opinion in the *Chenery* case, *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943), makes clear, only where "an order is valid only as a determination of policy or judgment which the agency alone is authorized to make" does the *Chenery* rule apply. As an appellate court we have the power to determine whether the regulation can legitimately be upheld under the statute; this determination is not for the agency alone and thus *Chenery* does not constrain us as applicable only to decisionmaking or adjudicative procedures, 3 K. Davis, *Administrative Law Treatise* § 14.29 at 128–31 (2d ed. 1980), as opposed to administrative rulemaking power, 2 *id.* at §§ 7.2, 7.25; *see also* Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199.

the Supreme Court suggested that *Katzel* had limited application to any but its own special facts.

Judgment affirmed.

WINTER, Circuit Judge, dissenting:

I respectfully disagree with the conclusion reached by my colleagues as to the validity of the customs regulation in question.

With regard to Congress's intent in enacting Section 526, I agree generally with Judge Silberman's discussion in *Coalition to Preserve the Integrity of Trademarks v. United States*, 790 F.2d 903 (D.C.Cir.1986), although I believe the legislative history to be somewhat more ambiguous than his opinion indicates.

Moreover, as Judge Silberman's opinion describes in detail, *id.* at 910–918, the history of the regulation itself reflects the Customs Service's own confusion over the purpose and validity of the regulation. The Service waited some thirteen years before enacting one version of it and then relied for the statutory basis on the Lanham Act's predecessor rather than on Section 526. Since then, the reasons given by the Service in support of the regulation have varied, and even now considerable doubt exists as to precisely what relevant policy it is intended to implement. Congress's supposed long-standing acquiescence, therefore, is of little weight in view of the lack of continuity in the Service's rationale. *Id.* at 916–918.

My colleagues rely upon the administrative difficulties faced by the Service in excluding grey market goods as a policy justifying the regulation. I believe that such reliance is misplaced. First, the purported administrative difficulties appear to be recently created justification to defend litigation in the 1980's. The Service never alluded to administrative difficulties when the regulation was originally promulgated a half century ago on the basis of the Lanham Act's predecessor, or later when it found the regulation's basis in a now defunct antitrust policy, or when it based the regulation upon the purported commands of Section 526.

Second, viewing this regulation as an attempt to lighten the Service's administrative burdens is a bootstrap argument. Enforcement of Section 526 as written is simplicity itself. Goods of foreign manufacture bearing a trademark owned by a U.S. citizen or firm must be excluded from the country absent written consent from the owner. Difficulties stemming from variations in grey market relationships or from a supposed need to find a mark's existing domestic goodwill arise only after determining that Section 526 does not exclude all grey market goods. In short, the administrative difficulties are encountered only after the major legal question as to the meaning of Section 526 has been resolved. Once that is resolved against excluding grey market goods, however, the validity of the regulation is beyond challenge.

The fact is that the Customs Service has over the years justified this regulation with arguments of opportunity tailored to whatever audience it happened to be addressing at the time. This is hardly unusual administrative behavior, although the degree of vacillation in this case is somewhat exceptional. The fact that courts may indulge in fiction in the area of administrative law more often than in any other field does not mean, however, that we cannot insist upon coherent fiction. *Cf. United States v. Diapulse Corp. of America*, 748 F.2d 56, 61–62 (2d Cir.1984).

I respectfully dissent.