**LEVER BROTHERS
COMPANY, Plaintiff,**

v.

**UNITED STATES of America, et
al., Defendants.**

Civ. A. No. 86–3151.

United States District Court,
District of Columbia.

Jan. 21, 1987.

**404**

James E. Magee, Reboul, MacMurray, Hewitt, Maynard & Kristol, Washington, D.C. and New York City, for plaintiff; Walter M. Volpi, Janice Handler, Lynne Darcy and Robert P. Devlin, New York City, of counsel.

Linda A. Halpern, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiff Lever Brothers Company (Lever Brothers), an American subsidiary of a foreign manufacturer of trademarked goods, seeks a preliminary injunction directing defendant United States Customs Service (Customs Service) to exclude importation of so-called "gray market goods" under the Tariff Act of 1930, 19 U.S.C. § 1526(a) (1982), and the Lanham Act, 15 U.S.C. § 1124 (1982).

Lever Brothers is a wholly-owned subsidiary of Unilever U.S., Inc., which is wholly-owned by Unilever N.V. (Unilever), a corporation organized under the laws of The Netherlands. Lever Brothers manufactures and distributes various household products including "Shield" deodorant soap and "Sunlight" light-duty liquid detergent. Lever Brothers owns the rights in this country to the "Shield" and "Sunlight"

trademarks, and it recorded these trademarks with the Customs Service on October 1, 1986.

Due to Lever Brothers' corporate relationship with Unilever, Lever Brothers is affiliated with a number of foreign registrants of the "Shield" and "Sunlight" trademarks. In particular, Lever Brothers Limited,[1] a corporation organized under the laws of the United Kingdom, produces "Shield" and "Sunlight" products for consumption in the United Kingdom. Many importers and distributors have diverted these products into the United States over the past several years. Lever Brothers now seeks to enjoin the Customs Service from allowing entry of these "gray market" goods into the United States, alleging that such importation violates the Tariff Act of 1930, 19 U.S.C. § 1526(a) (1982) (section 526), and the Lanham Act, 15 U.S.C. § 1124 (1982).

### I

Section 526(a) of the Tariff Act makes it "unlawful to import into the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States," provided that the trademark is properly registered, "unless written consent of the owner of such trademark is produced at the time of making entry." 19 U.S.C. § 1526(a) (1982). Section 526 subjects any such merchandise to seizure and forfeiture for violation of the customs laws, and subsection (c) of the same section provides that any person dealing in such merchandise may be enjoined from doing so or may be required to export or destroy the merchandise or remove or obliterate the trademark.

The pertinent Customs Service regulation excepts from seizure under section 526 imported articles bearing a trademark identical to the one held by a United States citizen or corporation when "[t]he foreign

---

1. Lever Brothers Limited is a wholly-owned subsidiary of Unilever PLC. Unilever PLC apparently is owned by Unilever N.V. Plaintiff

and Unilever PLC share at least one senior level manager.

and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control." 19 C.F.R. § 133.-21(c)(2) (1985). Lever Brothers' motion challenges this regulation, asserting that it is invalid, and that the Customs Service must enforce section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526 (1982), as its literal language appears to suggest. Similar relief was also sought by other litigants but was denied by the Court of International Trade in *Vivitar Corp. v. United States*, 593 F.Supp. 429 (Ct.Int'l Trade 1984), *aff'd*, 761 F.2d 1552 (Fed.Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986), and by the Second Circuit in *Olympus Corp. v. United States*, 792 F.2d 315 (2d Cir.1986), but was granted by the Court of Appeals for this Circuit in *Coalition to Preserve the Integrity of American Trademarks v. United States*, 790 F.2d 903 (D.C.Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 642, 93 L.Ed.2d —— (1986) (COPIAT).

■ In light of the fact that the Court of Appeals for this Circuit in *COPIAT* [2] declined to grant injunctive relief and stayed its mandate (pending determination of the government's petition for writ of certiorari), this Court is not bound by the *COPIAT* decision but may consider the substance of the issues presented by plaintiff's motion. This Court concludes that the regulation is a reasonable exercise of the Customs Service's enforcement discretion, for the following reasons.

■ First, the sole effect of the regulation is to define the Customs Service's role in initiating administrative enforcement of section 526(a). The regulation does not limit the scope of the statute but only the Customs Service's obligation to enforce it by excluding goods. *See Olympus*, 792 F.2d at 320; *Vivitar*, 761 F.2d at 1569.[3] The trademark owner still may pursue private remedies against the importer under section 526(c), notwithstanding the Customs Service's failure to exclude the goods. *Olympus*, 792 F.2d at 320; *Vivitar*, 761 F.2d at 1569. Since the regulation merely constitutes an exercise of enforcement discretion, the only question is whether the Service reasonably exercised that discretion when it promulgated the regulation.[4]

Second, consideration of the administrative difficulties that would result from a decision to require the Customs Service to change its stance leads to the conclusion that the regulation constitutes a reasonable exercise of the Customs Service's enforcement discretion. As both the *Vivitar* and the *Olympus* courts have noted, the variations in gray market importation are extensive and confusing. *Vivitar*, 761 F.2d at 1570 n. 24; *Olympus*, 792 F.2d at 320.[5]

---

**2.** In *COPIAT*, the Court of Appeals held that congressional intent underlying section 526 permits the prohibition of gray-market goods regardless of whether the domestic and foreign trademark holders are related entities and, in the alternative, that the Customs Service regulation is invalid as not constituting a reasonable interpretation of section 526(a). 790 F.2d at 908.

**3.** While Congress may delegate legislative authority to an agency in certain situations, there is no language in section 526 by which Congress delegated such authority to the Secretary of the Treasury in connection with administration of section 526. Without such authority, the Customs Service cannot affect the scope of a trademark owner's rights under the statute. *Vivitar*, 761 F.2d at 1569 (citing K. Davis, *Administrative Law Treatise* § 7.8 (2d ed. 1979)).

**4.** It appears that the Court of Appeals for this Circuit declined to uphold the regulation as a reasonable exercise of enforcement discretion because it found that "the Customs Service has never purported to justify these regulations as an exercise of enforcement discretion." 790 F.2d at 918. The court stated that the Customs Service, "from the start," has regarded its regulations as "its interpretation of what the law requires rather than as a decision not to prosecute to the letter of the law." *Id.* However, it is this Court's respectful view that an agency regulation cannot be accorded force as a legislative rule if there was no authority to adopt it as such in the first place.

**5.** The court said in *Vivitar*:
For example, the U.S. and foreign trademark rights may be owned by the same entity or by related companies, or by wholly separate companies. The goods of the U.S. owner may be imported and may be identical to, or different from, the parallel import. Goods may be produced in the U.S. by the U.S. trademark

Without a regulation of the kind under consideration here which provides a bright line for enforcement purposes, the Customs Service presumably would be placed in the position of having to determine at the border which goods possessed discrete domestic good will and, thus, should be excluded. This would require the Customs Service to expend funds and time to determine whether the markholder of such goods had developed an independent public image in this country, a decision that subsequently may only be overturned by private litigation. *See Olympus,* 792 F.2d at 320.

Third, congressional acquiescence in the Customs Service's interpretation of section 526 supports these conclusions. The House Ways and Means Committee, in connection with amendments of section 526 in the Customs Procedural Reform and Simplification Act of 1978, Pub.L. No. 95–410, section 211, 92 Stat. 888, 903, explicitly recognized the Customs Service's then twenty years of excluding gray market goods. 792 F.2d at 320 (citing H.R.Rep. No. 621, 95th Cong., 1st Sess. 27 (1977)), and Congress took no action to alter this approach. This inaction may be an indicia of congressional acceptance of the Customs Service's interpretation. *Id. See Haig v. Agee,* 453 U.S. 280, 297–98, 101 S.Ct. 2766, 2776–77, 69 L.Ed.2d 640 (1981). Moreover, when Congress considered amending the customs law in 1954, it was again informed of the Customs Service's practice of permitting parallel importation, it specifically noted the practice, but it declined to change it while amending other parts of section 526 in 1978. *See* 792 F.2d at 321 (citations omitted). The Court therefore agrees with the Second Circuit, "that in light of the long acceptance of the regulations change is a matter for the legislative or executive branch and not the judiciary," 792 F.2d at 321, and it holds that the Customs Service

regulation constitutes a reasonable exercise of enforcement discretion.

■ Lastly, since the Supreme Court has granted certiorari in *COPIAT* and thus is presently reviewing substantive issues which also underlie the injunctive relief requested in this case, the Court believes that the equities and sound judicial policy caution against the contemporaneous issuance of an affirmative injunction against the Customs Service. If the Court were to grant the injunction, the result would be that the Customs Service would be ordered to take action which the Supreme Court might, in short order, determine not to be required by law. It is presumably for similar reasons that the Court of Appeals stayed its mandate. In the exercise of its equitable discretion, therefore, and in the promotion of public interest, the Court will deny the relief requested by plaintiff pursuant to the Tariff Act.

## II

Plaintiff fares no better under the Lanham Act. Section 42 of that statute, 15 U.S.C. § 1124 (1982), prohibits the importation of goods which "copy or simulate" a registered trademark. Whether a genuine foreign trademark can be deemed to "copy or simulate" a domestic trademark has been the subject of considerable debate.

In the seminal case of *A. Bourjois & Co. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam), the Supreme Court held in a memorandum opinion that section 27 of the Trademark Law of 1905 (the predecessor of section 42 of the Lanham Act) barred importation of goods produced abroad and bearing the genuine trademark where an independent domestic trademark owner purchased the United States trademark rights from the foreign trademark owner. The Court further stated that the Collector of Customs was re-

---

owner and different goods produced abroad by the U.S. owner or by its affiliate. Services and warranties may or may not be the same here and abroad. A foreign licensee (i.e., related company) may be required by foreign law and may not be subject to meaningful control by the U.S. owner. A number of such

actual variations are indicated by the cases cited in this opinion; others are discussed in Takamatsu, *Parallel Importation of Trademarked Goods: A Comparative Analysis,* 5 Wash.L.Rev. 433 (1982).
761 F.2d at 1570 n. 24.

quired to exclude from entry such goods. This decision was based "upon the authority of *A. Bourjois v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464, the defendant [Aldridge] not objecting." Thus, infringement was found with respect to arguably "genuine" goods.

Because the *Aldridge* decision was a one-sentence, per curiam opinion to which the opposing party did not object, several courts have narrowly construed the scope of that decision. In particular, this Court has held that if the domestic and foreign trademark holders are related to, rather than independent of, each other, section 42 only bars merchandise bearing counterfeit or spurious trademarks that "copy or simulate" genuine trademarks. *See COPIAT,* 598 F.Supp. 844 (D.D.C.1984), *rev'd on other grounds, supra,* 790 F.2d 903. *Accord Olympus Corp., supra,* 792 F.2d at 321–22; *Parfums Stern, Inc. v. United States Customs Service,* 575 F.Supp. 416 (S.D.Fla. 1983).

This conclusion is strengthened by the fact that the equities of the *Katzel* case, upon which the decision in *Aldridge* largely rested, are not present when the foreign and domestic trademark holders are related. In *Katzel,* the foreign manufacturer had sold its business and trademark in this country to the plaintiff and in France to the defendant, a company completely independent of plaintiff. The Supreme Court held that the Act barred importation of defendant's goods into the United States even though defendant's goods were "genuine." 260 U.S. at 690, 43 S.Ct. at 245. This holding was "intended to overcome the unfairness of permitting the foreign manufacturer, having sold its trademark rights to another, to thereafter arrange to have its goods marketed in the United States by someone other than the independent American purchaser." *COPIAT,* 598 F.Supp. at 848. Indeed, the Supreme Court itself has suggested (*Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924)), that *Katzel* had limited application to any but its own special facts.

 For the foregoing reasons, this Court holds that Lever Brothers' motion for a preliminary injunction must be denied.