**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMERICAN CIRCUIT BREAKER
CORPORATION, a New York
corporation,
　　　　*Plaintiff-Appellant,*

　　　　v.

OREGON BREAKERS INC., an Oregon
Corporation; STEPHEN REAMES, an
Oregon resident,
　　　　*Defendants-Appellees.*

No. 03-35375

D.C. No.
CV-01-00308-DCA

OPINION

Appeal from the United States District Court
for the District of Oregon
Donald C. Ashmanskas, Magistrate, Presiding

Argued and Submitted
June 9, 2004—Seattle, Washington

Filed April 25, 2005

Before: Melvin Brunetti, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

Alan S. Cooper, Shaw Pittman, Washington, D.C., for the plaintiff-appellant.

Todd L. Van Rysselberghe, Kennedy, Watts, Arellano & Ricks, Portland, Oregon, for the defendant-appellee.

**OPINION**

McKEOWN, Circuit Judge:

Few subjects have generated more ink and consternation in the trademark arena in recent years than the topic of parallel imports/gray market goods. In general terms, a gray market good, often referred to as a parallel import, is "[a] foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 285 (1988). Indeed, the debate is not a new one, as Congress jumped on the bandwagon in the early 1900s to provide United States trademark holders a remedy under the Tariff Act against importation of genuine goods bearing a United States trademark. Tariff Act of 1922 § 526, 42 Stat. 975 (later reenacted in identical form as Tariff Act of 1930 § 526, 19 U.S.C. § 1526). That legislation, amended over the years, did not quell the confusion and uncertainty, especially regarding the relationship between infringement claims under the Lanham Act and claims under the Tariff Act.

It is no surprise then that the parties to this dispute have diametrically opposed views as to how the case should be analyzed. At issue is the sale in the United States of circuit breakers imported from Canada under the trademark STAB-LOK. In an ironic twist, the circuit breakers are gray. Whether viewed as a gray market case or not, American Circuit Breaker Corporation ("ACBC") must establish a "likelihood of confusion" to prevail.

The essential facts are undisputed. ACBC holds the STAB-LOK trademark in the United States. Schneider Canada holds the STAB-LOK trademark in Canada. Federal Pioneer Limited ("Pioneer"), a subsidiary of Schneider Canada, manufactures circuit breakers for itself and ACBC. The circuit breakers sold by the companies are identical except for the casing color. Pioneer manufactures black circuit breakers for

ACBC and gray ones for itself. The parties have stipulated that, except for the casing color, there are no material differences between the products, and that the gray circuit breakers are "genuine" versions of the black ones. This dispute arose because Oregon Breakers bought gray circuit breakers from a Canadian third-party supplier and, without permission from ACBC, sold them in the United States.

The question we address is whether the district court erred in dismissing ACBC's claims against Oregon Breakers for trademark infringement and unfair competition. We affirm the court's dismissal of the claims.

## I.    FACTUAL BACKGROUND

Although the current relationships among the various companies are fairly straightforward, we briefly discuss the history of the STAB-LOK trademark because an understanding of where and when the parties derived their trademark rights provides useful background to our analysis.

In 1950, Federal Pacific Electric Company ("FPE") adopted the trademark STAB-LOK for circuit breakers. FPE eventually sold its U.S. circuit breaker business, including the U.S. STAB-LOK trademark, to Challenger Electric. In 1988, Challenger Electric sold the circuit breaker portion of its business to ACBC's predecessor, which in turn assigned all of its rights in the business and trademark to Provident Industries, Inc. Provident Industries, Inc. changed its corporate name to American Circuit Breaker Corporation in late 1988.

Since 1950, ACBC and its predecessors have continuously used the trademark STAB-LOK on advertising, marketing, and sales of circuit breakers in the United States. ACBC is the record owner of the U.S. mark STAB-LOK, which was issued in 1988. Under the Lanham Act, the mark is incontestable and ACBC has the exclusive right to use the mark. *See Entrepre-*

*neur Media, Inc. v. Smith*, 279 F.3d 1135, 1139 n.1 (9th Cir. 2002) (citing 15 U.S.C. §§ 1065, 1115(b)).

In 1952, Federal Electric Products Company, a U.S. company that was later merged into FPE, registered the trademark STAB-LOK in Canada. Until 1988, Pioneer, the manufacturer of the gray circuit breakers, was a Canadian subsidiary of FPE. The Canadian registration of STAB-LOK was assigned to Pioneer in 1986.

In 1988, FPE sold Pioneer to a Canadian company that had no relationship to Challenger Electric or any other predecessor of ACBC. In 1999, Pioneer assigned the Canadian trademark STAB-LOK to its parent company, Schneider Canada.

Prior to 1993, ACBC manufactured black STAB-LOK circuit breakers for the U.S. market at its plant in Albemarle, North Carolina, and Pioneer manufactured in Canada gray STAB-LOK circuit breakers for the Canadian market. Following an intellectual property dispute in the early 1990s, ACBC entered into an agreement with Pioneer and Schneider Canada.

Part of the dispute centered around Pioneer's claim that it had acquired rights to market under the STAB-LOK mark in the United States, as well as Canada. Although the details of the settlement agreement are confidential, the parties reveal the key elements in their briefs. Under the agreement, Pioneer manufactures black STAB-LOK circuit breakers for ACBC for sale in the United States and ACBC has agreed to purchase guaranteed minimums from Pioneer. Pioneer continues to manufacture gray STAB-LOK circuit breakers for sale in Canada by Pioneer. The agreement forbids Pioneer from selling its STAB-LOK circuit breakers in the United States for the term of the agreement. The effect of the agreement is that, although ACBC originally acquired its U.S. rights in the STAB-LOK mark from Challenger Electric, a U.S. company,

ACBC's exclusivity of those trademark rights came about through the deal it struck with Pioneer, a Canadian company.

Accordingly, since 1993, both black and gray circuit breakers have been manufactured by Pioneer in Canada and both bear the STAB-LOK trademark, as well as an indication that "Federal Pioneer Limited" is the manufacturer and that the breakers are manufactured in Canada. The parties agree that there are no material differences between ACBC's black STAB-LOK circuit breakers and the gray STAB-LOK circuit breakers. Finally, the agreement provides that ACBC will assign its rights in the trademark STAB-LOK to Pioneer at the conclusion of the agreement.

From 1997 to 2000, Oregon Breakers sold gray Pioneer-manufactured STAB-LOK circuit breakers in the United States. Oregon Breakers purchased the circuit breakers from Merchant Pier, a Canadian distributor of circuit breakers and imported them into the United States for resale.

In sum, this case involves a U.S. trademark owner which contracts with a foreign, but historically affiliated manufacturer that owns the identical trademark in the foreign jurisdiction. The foreign trademark owner legitimately manufactures goods for both markets, which goods are identical except for color. A third party then imports identical goods manufactured under the foreign trademark into the United States, in competition with the U.S. trademark owner's products.

## II.   PROCEDURAL HISTORY

ACBC filed suit in the District of Oregon asserting claims for trademark infringement, unfair competition, and trademark dilution against Oregon Breakers. ACBC initially sought partial summary judgment on its claim for trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114, and the related claim of unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125.

In ruling on the summary judgment motion, the district court pointed out that "the gray circuit breakers are manufactured in Canada by the same manufacture[r] from which ACBC imports 'genuine' breakers" and that "[Pioneer] and ACBC are not completely at arm's length." The court also noted that "ACBC concedes that there is no material difference between the gray and black breakers." In an Opinion and Order, the district court denied the motion, however, because there were material questions of fact as to whether the gray circuit breakers were genuine and whether the quality control procedures resulted in differences between the breakers.

After denial of ACBC's motion, the parties stipulated to entry of final judgment, with ACBC reserving its right to appeal the dismissal of the trademark and unfair competition claims. In the stipulation, the parties agreed that:

> There are no material differences between ACBC's black STAB-LOK circuit breakers and the gray STAB-LOK circuit breakers offered for sale and sold by Oregon Breakers. The gray STAB-LOK circuit breakers accordingly are "genuine products" as that term is defined by the Court at p. 6 of the Opinion and Order.[1]

Although the stipulation effected a complete dismissal with prejudice of all claims, the parties stipulated that in the event of reversal and an eventual trial, the issues of the strength and meaning of the trademark STAB-LOK, and whether ACBC has exercised control over the quality of the black STAB-

---

[1] In its Opinion and Order, the district court cited *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302-03 (3d Cir. 1998), for the proposition that "[t]he test for whether an alleged infringer's products are genuine asks whether there are 'material differences' between the products sold by the trademark owner and those sold by the alleged infringer."

LOK circuit breakers manufactured by Pioneer for ACBC for resale in the United States would be resolved at trial.[2]

The district court accepted the stipulation, entered a final judgment that incorporated the stipulation and various modifications of its earlier Opinion and Order, and dismissed all of ACBC's claims. ACBC appeals only the dismissal of its claims for trademark infringement and unfair competition.

## III.   DISCUSSION

### A.   *Katzel* AND THE EMERGENCE OF TERRITORIALITY

It is now generally agreed and understood that trademark protection encompasses the notion of territoriality. The Supreme Court ushered in this concept more than eighty years ago in *A. Bourjois & Co. v. Katzel*, 260 U.S. 689 (1923). Understanding *Katzel* in the context of the transition from the notion of universality of trademarks to the emergence of territoriality sheds light on the dispute here.

As McCarthy, one of the leading commentators in the trademark arena notes: "Early U.S. cases refused to protect U.S. trademark owners from parallel imports of genuine goods obtained from the foreign manufacturer." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 29:51 (4th ed. West 2005) (citing *Apollinaris Co. v. Scherer*, 27 F. 18 (C.C.N.Y. 1886)); *Fred Gretsch Mfg. Co. v. Schoening*, 238 F. 780 (2d Cir. 1916)). These early cases were decided under the then-dominant principle of universality of trademarks. The universality principle

---

[2]We closely scrutinized the stipulation to assure ourselves that there was a complete dismissal of all claims. We are satisfied that there was a final judgment and that the parties' articulation of these two issues was meant to clarify that the dismissal was predicated on the stipulation and that, in the view of the parties, these two matters were not material issues of fact nor were they stipulated issues of fact.

stands for the proposition that a trademark serves the sole purpose of identifying the source of a product. Under this principle, a trademark is valid if it correctly identifies the origin or source of the product, regardless of where the consumer purchases the product. A gray market product does not violate trademark rights under the universality principle as long as it bears a genuine trademark that identifies the source of the product.

Jerome Gilson, *1 Trademark Protection and Practice*, § 4.05[5] (2004). *Katzel* came to the Supreme Court on a writ of certiorari from the Second Circuit. The plaintiff in *Katzel* purchased a French cosmetic firm's U.S. business, along with its goodwill and U.S. trademark "Java," which was used on face powder. *Katzel*, 260 U.S. at 690. The plaintiff continued to purchase the face powder from the French firm and used "substantially the same form of box and label as its predecessors" but "uses care in selecting colors suitable for the American market . . . ." *Id.* at 691. The Court pointed out that "the labels have come to be understood by the public here as meaning goods coming from the plaintiff." *Id.* The defendant was a third party who purchased the same face powder in France and resold it in the United States "in the French boxes which closely resemble those used by the plaintiff . . . ." *Id.*

**[1]** Following precedent based on the principle of universality, the Second Circuit concluded that there was no trademark infringement. *A. Bourjois & Co. v. Katzel*, 275 F. 539, 540 (2d Cir. 1921) ("The question is whether the defendant has not the right to sell this article under the trade-marks which truly indicate its origin. We think she has."). In quick response to the ruling and with the intent of overruling the decision, Congress enacted § 526 of the Tariff Act of 1922, while *Katzel* was on appeal. *See K Mart*, 486 U.S. at 287-88; *see also* McCarthy, *supra*, § 29:51. Section 526, which has since been reenacted as § 526 of the 1930 Tariff Act, 19 U.S.C. § 1526, prohibits importation of foreign-manufactured

goods bearing a registered trademark owned by a U.S. citizen or corporation. Unlike a trademark infringement action under § 32 of the Lanham Act, the remedy under § 526 is prohibition of importation of the goods.

The Supreme Court subsequently reversed the Second Circuit and held that the plaintiff's trademark rights were infringed, though the Court did not reference the new legislation. *Katzel*, 260 U.S. at 691. The Court reasoned that the "monopoly of a trade-mark . . . deals with a delicate matter that may be of great value but that easily is destroyed, and therefore should be protected with corresponding care." *Id.* at 692. The Court then explained:

> It is said that the trade-mark here is that of the French house and truly indicates the origin of the goods. But that is not accurate. It is the trade-mark of the plaintiff only in the United States and indicates in law, and, it is found, by public understanding, that the goods come from the plaintiff although not made by it. It was sold and could only be sold with the good will of the business that the plaintiff bought. It stakes the reputation of the plaintiff upon the character of the goods.

*Id.* at 692 (internal citation omitted).

The *Katzel* decision marked a dramatic change in trademark law by adopting the principle of "territoriality" of trademarks and moving away from the rule of "universality." *See* McCarthy, *supra*, § 29:51; Gilson, *supra*, § 4.05[5]. Under the territoriality principle, a "trademark has a separate legal existence in each country and receives the protection afforded by the laws of that country." *Gilson, supra*, § 405[5].

Between the Supreme Court's decision in *Katzel* and the early 1980s "the legal journals [were] the main battleground" over the issue of whether a U.S. trademark holder could pre-

vent the importation of "genuine" gray market goods. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 548 F. Supp. 1063, 1065 (E.D.N.Y. 1982). Changing world economic conditions during the 1980s ushered in a dramatic increase in the number of cases dealing with the issue. *See* McCarthy, *supra*, § 29:46.

Some courts limited *Katzel* to its particular facts. *See, e.g.*, *Weil Ceramics and Glass, Inc. v. Jalyn Corp.*, 878 F.2d 659, 669 (3d Cir. 1989) ("We do not read *Katzel* to extend beyond [its] circumstance."); *Olympus Corp. v. United States*, 792 F.2d 315, 321-22 (2d Cir. 1986) (holding that § 42 of the Lanham Act did not apply to genuine goods in cases that did not present the same equities as *Katzel*). In contrast, in *Osawa v. B & H Photo*, 589 F. Supp. 1163 (S.D.N.Y. 1984), the court thoroughly embraced the shift from universality to territoriality ushered in by *Katzel*, explaining that, under the territoriality principle:

> [a trademark's] proper lawful function is not necessarily to specify the origin or manufacture of a good (although it may incidentally do that), but rather to symbolize the domestic goodwill of the domestic markholder so that the consuming public may rely with an expectation of consistency on the domestic reputation earned for the mark by its owner, and the owner of the mark may be confident that his goodwill and reputation (the value of the mark) will not be injured through use of the mark by others in domestic commerce.

*Id.* at 1172.

More recently, the principle of territoriality "has been criticized as obsolete in a world market where information products like computer programs cannot be located at a particular spot on the globe." McCarthy, *supra*, § 29:1. Nevertheless, *Katzel* remains good law and found expression in the more recent *K Mart* case.

### B.   *K Mart* AND GRAY MARKET GOODS

In 1988, the Supreme Court in *K Mart* provided a useful tutorial on gray market goods. *K Mart* involved a challenge to Customs Service regulations implementing § 526 of the Tariff Act.[3] The Court began its opinion by explaining that "A gray-market good is a foreign-manufactured good, *bearing a valid United States trademark*, that is imported without the consent of the United States trademark holder." *K Mart*, 486 U.S. at 285 (emphasis added). The Court then went on to describe the three general gray market scenarios.

The "prototypical" context, based on *Katzel*, *see id.* at 287, arises where "a domestic firm . . . purchases from an independent foreign firm the rights to register and use the latter's trademark as a United States trademark and to sell its foreign-manufactured products here." *Id.* at 286. If the foreign manufacturer or a third party imports the products into the United States, they would be gray market goods competing with the trademark holder's goods. *Id.*

The second gray market scenario is where a domestic firm registers the U.S. trademark "for goods that are manufactured abroad by an affiliated manufacturer." *Id.* The Court detailed three variations that fit under this example: a) a foreign firm incorporates a subsidiary in the United States which then registers the U.S. trademark (which is identical to the foreign parent firm's trademark) in its own name; b) "an American-based firm establishes abroad a manufacturing subsidiary corporation"; or c) an American-based firm establishes abroad "its own unincorporated manufacturing division . . . to pro-

---

[3]Although *K Mart* involved § 526 of the Tariff Act, it serves as guidance for our analysis of §§ 32 and 43 of the Lanham Act. *See Weil Ceramics & Glass, Inc.*, 878 F.2d at 661 ("*K Mart* is also instructive to the disposition of the Appellee/Cross-Appellant's contentions regarding §§ 42 and 32."); *see also* Gilson, *supra*, § 4.05[4] (noting that the customs service has adopted the likelihood of confusion test of § 32 of the Lanham Act in determining whether a violation of § 526 exists).

duce its United States trademarked goods, and then imports them for domestic distribution." *Id.* at 286-87. All of these variations involve "common control" of the United States and foreign trademark holders. *See* Gilson, *supra*, § 4.05[6].

The third gray market scenario is where the "domestic holder of a United States trademark *authorizes* an independent foreign manufacturer to use it." *K Mart*, 486 U.S. at 287 (emphasis in original). "Usually the holder sells to the foreign manufacturer an exclusive right to use the trademark in a particular foreign location, but conditions the right on the foreign manufacturer's promise not to import its trademarked goods into the United States." *Id.* This situation usually arises when the U.S. firm owns both the domestic and foreign trademarks and licenses its use to a foreign manufacturer in a foreign country. *See* Gilson, *supra*, § 4.05[6].

The circumstances here most closely approximate *Katzel*, which is also *K Mart's* case 1. There are both similarities and differences between *Katzel* and the present case. In each case, separate companies owned the trademark in the United States and the trademark in the foreign jurisdiction. In both cases the plaintiff and the third party defendant acquired the product from the foreign manufacturer. And, in both cases the plaintiff's product has a valid U.S. trademark and the defendant's product has a valid trademark from the foreign trademark owner. Although ACBC did not purchase the U.S. trademark from a foreign company, its predecessor purchased those rights from a U.S. company that was a common predecessor to ACBC and Pioneer. And, unlike the labels in *Katzel*, the record here does not indicate that the black circuit breaker casing "ha[s] come to be understood by the public here as meaning goods coming from the plaintiff." *Katzel*, 260 U.S. at 691.

At least one prominent commentator has argued that the first *K Mart* context did not fit the definition of gray market at all because "the U.S. trademark owner did not own the

mark abroad." Gilson, *supra*, § 4.05[6]. Indeed, determining whether such goods should be labeled as gray market is a bit tricky given the fact that the Supreme Court explained that gray market goods must have "a valid United States trademark," but also described the first *K Mart* context as the prototypical gray market situation. Caught up in the confusion, the parties spend a great deal of energy wrangling over whether this is a gray market case. ACBC claims it is not bringing a gray market claim because the marks are owned by independent corporations. Oregon Breakers argues that, as a result of the 1993 agreement, the companies are not truly unrelated and that the relationship fits within several of the *K Mart* criteria.

**[2]** In the end, whether this is technically classified as a gray market case or not does not drive the solution. Ultimately, what is at issue is whether there is a likelihood of confusion as to source under the well established precedent of §§ 32 and 4B(a) of the Lanham Act.[4] Neither *Katzel* nor *K Mart* preclude a finding of trademark infringement as a matter of law in this context. As McCarthy notes, "the ultimate issue in a trademark infringement suit against the importer of gray market imports is the factual question of likelihood of confusion of U.S. customers." McCarthy, *supra*, § 29.46; *see Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999) ("The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products.") (citations omitted); *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir.

---

[4]It bears noting that the circumstances of this case suggest that ACBC would have had a remedy under the Tariff Act. *See K Mart*, 486 U.S. at 288 (explaining that, subject to certain exceptions, § 526 of the Tariff Act prohibits the importation of "[f]oreign-made articles bearing a trademark identical with one owned and recorded by a citizen [or corporation] of the United States"); *Parfums Givenchy v. Drug Emporium, Inc.*, 38 F.3d 477, 484 (9th Cir. 1994) (explaining same, and noting that the purpose of § 526 "is to protect domestic companies against foreign competition").

1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical is there a 'likelihood of confusion?' "); *see also Societe Des Produits Nestle v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992) ("Whether the fulcrum of plaintiffs' complaint is perceived as section 32(1)(a), section 42, or section 43(a), liability necessarily turns on the existence vel non of material differences between the products of a sort likely to create consumer confusion.").

## C. ABSENCE OF THE LIKELIHOOD OF CONFUSION

The likelihood of confusion test centers on weighing the so-called *Sleekcraft* factors that range from the strength of the mark to the degree of care customers are likely to exercise. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These factors do not guide our analysis here, however, because the parties have, in effect, short circuited the case through their stipulation.

[3] Determining whether the record sustains an infringement claim is not straightforward in this instance. This case is made more complicated by the parties' efforts to resolve it via stipulation and subsequent dismissal of claims. Rather than a clean set of district court findings or a comprehensive opinion, we are left to piece together the meaning of the final judgment, which incorporates but modifies the court's earlier Opinion and Order and encompasses the parties' factual stipulations. Reading the record in conjunction with the final judgment leads us to conclude that there is no material issue of fact with respect to infringement, that ACBC failed to establish infringement and, consequently, the dismissal of claims was appropriate.

The bulk of the record evidence relates to the nature of the circuit breakers sold by Oregon Breakers, namely whether they are genuine STAB-LOK circuit breakers and the quality control conditions of their manufacture. After much back and

forth, the parties stipulated that there are no material differences between the black and the gray breakers, and that the gray breakers are "genuine" products in relation to the black breakers.

[4] Because of this stipulation and the related court order, this case is governed by the rule we set out in *NEC Elecs. v. Cal Circuit ABCO*, 810 F.2d 1506, 1510 (9th Cir. 1987) (citations omitted): "Trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent." Here, the parties have agreed that the goods were genuine vis-a-vis the ACBC goods bearing the same mark.[5] The *NEC* rule makes good sense and comports with the consumer protection rationale of trademark law: "[T]rademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *Id.*

[5] The upshot of the stipulation between ACBC and Oregon Breakers is that consumers purchasing circuit breakers from Oregon Breakers are getting exactly the same circuit breaker, both in specification and quality, as they would purchase from ACBC. In other words, the goods are genuine. Rather than being confused, customers who purchase the gray STAB-LOK circuit breakers from Oregon Breakers get exactly what they expect. *See Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 303 (3d Cir. 1998) ("[W]hen the differences between the products prove so minimal that consumers who purchase the alleged infringer's goods 'get precisely what they believed that they were purchasing,' consumers' perceptions of the trademarked goods are not likely to be affected by

---

[5]Because of the unusual factual backdrop in this case and the multiple stipulations of the parties, we need not consider the situation in which goods bearing a foreign trademark are sold in the United States and the distributor markets goods "of one make under the trademark of another." *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 128 (1947).

the alleged infringer's sales.") (internal citation omitted). In short, because there is no material fact as to infringement, ACBC's claims of trademark infringement and unfair competition must fail.

What is missing here is evidence of infringement that undermines ACBC's goodwill or leaves consumers in a state of "legal confusion." As the First Circuit observed:

> By and large, courts do not read Katzel and Aldridge to disallow the lawful importation of identical foreign goods carrying a valid foreign trademark. . . . [T]erritorial protection kicks in under the Lanham Act where two merchants sell physically different products in the same market and under the same name, for it is this prototype that impinges on a trademark holder's goodwill and threatens to deceive consumers.

*Societe Des Produits Nestle*, 982 F.2d at 637 (internal citations omitted). We do not need to go as far as our sister circuit's circumscription of *Katzel* because the answer here is found in the parties' stipulated record as to genuine products.

## IV. CONCLUSION

[6] Although ACBC frames the issue as the district court's error in declining to grant partial summary judgment in its favor, the stipulations changed the face of the case and moved it beyond the initial motion. As to the motion, we agree that the district court correctly pinpointed several material disputed facts that precluded judgment in favor of ACBC. Once those disputes fell out of the case via stipulation, the question is whether the district court properly dismissed ACBC's claims. We conclude that the dismissal is supported by the law, the stipulation, and the record.

**AFFIRMED.**